Filed 6/23/17

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B256046 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. Nos. BA382701 & BA376026 |
| PIER'ANGELA SPACCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen A. Kennedy, Judge. Affirmed in part, reversed in part, with directions.

Dwyer + Kim and John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1100, 8.1105(b), and 8.1110, this opinion is certified for publication with the exception of parts 1 and 3 of the Discussion.

# INTRODUCTION

This case arises out of the highly publicized corruption scandal in the City of Bell (Bell). The scandal erupted in 2010, after it was discovered that the city manager, assistant city manager, and five city council members were receiving astronomical salaries and fringe benefits, which they had taken care to conceal from their constituents. The subsequent investigation focused in large part on the actions of the longtime city manager, Robert Rizzo, and the assistant city manager, defendant and appellant Pier'Angela Spaccia.

As pertinent here, a jury convicted Spaccia of 11 counts relating to the corruption scandal, including five counts of misappropriation of public funds (Pen. Code, § 424), one count of conspiracy to misappropriate public funds (Pen. Code, § 182, subd. (a)(1)), four counts of conflict of interest by a public official (Gov. Code, §§ 1090, 1097) and one count of secreting an official record (Gov. Code, § 6200). Spaccia challenges the judgment of conviction on several grounds.

With respect to the five counts of misappropriation of public funds, Spaccia asserts we must reverse the two convictions related to unauthorized loans she received from Bell due to insufficient evidence. We reject this contention because the jury could reasonably have concluded she was criminally negligent by failing to take steps to determine whether those loans were authorized. Spaccia also asserts that the instructions given here for all of the misappropriation counts incorrectly allowed the jury to convict her based upon her status as a city officer alone, without also requiring the jury to find that she exercised some material degree of control over public funds. We agree the instructions were erroneous in light of *People v. Hubbard* (2016)

63 Cal.4th 378 (*Hubbard*), a decision issued after Spaccia's trial, clarifying the scope of Penal Code section 424. Furthermore, we cannot say the error was harmless beyond a reasonable doubt. Accordingly, we reverse the five convictions for misappropriation of public funds in counts 3, 4, 10, 12 and 13.

Further, Spaccia contends the conflict of interest conviction based on her involvement in changing Bell's pension plan must be reversed because the plan is not a contract within the meaning of Government Code section 1090. Instead, she argues the pension plan is a form of deferred compensation incident to her employment with Bell, and because she was convicted of conflicts of interest in relation to her employment contracts in counts 4, 5, and 6, she cannot be convicted in count 2 for making the same employment contracts. We affirm the conviction on count 2 because amendments to the pension plan effectively modified the terms of Spaccia's employment with Bell, and therefore constituted the making of a contract within the meaning of Government Code section 1090.

Finally, with respect to sentencing, Spaccia contends the abstract of judgment erroneously states she is required to serve her sentence in state prison due to a current or prior conviction for a serious or violent felony (Pen. Code, § 1170, subd. (h)(3)). The People concede the point, and we direct the court to correct the abstract of judgment.

3

## PROCEDURAL BACKGROUND

By information dated October 3, 2013,[1] the People charged Spaccia with 13 counts related to the Bell public corruption scandal: one count of conspiracy to misappropriate public funds, in violation of Penal Code section 182, subdivision (a)(1)[2] (count 1); four counts of conflict of interest, in violation of Government Code sections 1090 and 1097 (counts 2, 5, 6 and 7); six counts of misappropriation of public funds in violation of section 424, subdivision (a) (counts 3, 4, 10, 11, 12 and 13); and two counts of unlawful secretion of an official record in violation of Government Code section 6200 (counts 8 and 9). The information alleged that the losses for counts 3 through 7, and 11 through 13, exceeded $1,300,000 (§ 12022.6, subd. (a)(3)), and involved theft of more than $100,000 (§ 1203.045, subd. (a)).

A jury acquitted Spaccia on count 8 and the court declared a mistrial as to count 11, after finding the jury was hopelessly deadlocked on that count; the court later dismissed count 11. The jury found Spaccia guilty of the remaining counts and found all allegations true.

---

[1]    The People originally filed two cases in 2011, one by information and the other by indictment, naming Spaccia and Rizzo as co-defendants. The court dismissed two counts of the indictment against Spaccia for lack of probable cause under Penal Code section 995, subdivision (a). The cases were later consolidated. Because Spaccia and Rizzo were not tried together, the People filed an amended information containing only the counts naming Spaccia as a defendant, solely for use during Spaccia's trial. We refer throughout our opinion to the renumbered counts contained in the amended information dated October 3, 2013.

[2]    All undesignated statutory references are to the Penal Code.

4

The court sentenced Spaccia to an aggregate determinate term of 11 years and eight months. The court selected count 4 as the base term and imposed the upper term of four years. (§ 424, subd. (a).) For counts 3, 10, 12, and 13, the court imposed a total of four years—one-third the midterm of three years for each count—to run consecutive. (§ 424, subd. (a).) The court imposed eight months for count 2—one-third the midterm of two years—to run consecutive. (Gov. Code, §§ 1090, 1097.) For counts 5, 6, and 7, the court imposed the midterm of two years, to run concurrent. (Gov. Code, §§ 1090, 1097.) For counts 1 and 9, the court imposed the midterm of three years, to run concurrent. (§ 182, subd. (a)(1); Gov. Code, § 6200.) Finally, the court imposed an additional three years for the high-value property enhancement, to run consecutive. (§ 12022.6, subd. (a).) Spaccia was ordered to serve her sentence in state prison pursuant to section 1170, subdivision (h)(3), due to a current or prior serious or violent felony.[3]

In addition to a restitution fine ($2,200), a court assessment ($440), and a conviction assessment ($330), the court imposed a victim restitution order under section 1202.4, subdivision (f), in the amount of $8,254,776.

## FACTUAL BACKGROUND

### 1. Background

The City of Bell is a small city in Los Angeles County. In 2006, Bell became a charter city; prior to that time, it was a general law city. Robert Rizzo was Bell's Chief Administrative Officer during the entire period relevant here.

---

[3] As the People concede, this finding was erroneous.

In 2002, Spaccia began working for Bell as a consultant. In 2003, Rizzo invited her to take a full-time employee position as Assistant to the Chief Administrative Officer. Initially, Spaccia was Bell's fiscal officer. Rizzo assigned Spaccia to mentor Lourdes Garcia so that she would eventually take over that position. Garcia had a long history with Bell; she started as an account clerk and worked her way up to director of administrative services.[4] Due to a personality clash between Garcia and Spaccia, Rizzo reassigned Spaccia in 2005 to handle special projects, including budgeting, audits, and Bell's annual financial reports. In 2007, Spaccia's title changed from Assistant to the Chief Administrative Officer to Assistant Chief Administrative Officer, but her job responsibilities did not change. In 2010, Rizzo removed Spaccia from Bell entirely and assigned her to work in the City of Maywood.[5] The city council terminated Spaccia's employment in July 2010.

During her employment at Bell, Spaccia took several extended leaves of absence to care for family members and to recover from surgeries she underwent for back problems. Spaccia was fully paid during her absences, and was not required to take sick or vacation leave.

---

[4]     Garcia testified under an immunity agreement.

[5]     Rizzo agreed to lend Bell staff to the City of Maywood to assist with that city's financial problems.

## 2.    Pension plan[6]

One of Spaccia's first assignments at Bell was to create a new, supplemental pension plan.  Spaccia worked with Alan Pennington, an actuary and pension fund specialist at a subsidiary of Wells Fargo.  Although he dealt almost exclusively with Spaccia, Pennington understood Rizzo was the decision maker, and Spaccia was the messenger, regarding the new pension plan.

At the time, non-safety employees of Bell were eligible for a pension benefit through CalPERS, which provided 2 percent of salary per year of service, starting at age 55.  Rizzo wanted the new plan to provide an additional 1 percent benefit, for a total retirement benefit of 3 percent of salary per year of service.[7]

At trial, Pennington explained that certain pension plans are subject to an income cap pursuant to ERISA.[8]  The amount of the income cap is set by the Internal Revenue Service (IRS) on an annual basis, and employers must observe the cap so that their contributions to the plan qualify for favorable tax treatment.  The income cap is changed annually, and ranged between $200,000 and $260,000 during the time Pennington worked with Bell.  The effect of the income cap is to limit the amount of benefit an employee can receive to a maximum, calculated with reference to the income cap.  In other words, an employee would receive a

---

[6]      In count 2, the jury convicted Spaccia of violating Government Code sections 1090 and 1097 in relation to the City of Bell Supplemental and Replacement Pension Plan.

[7]      Safety employees already received a 3 percent pension benefit.

[8]      Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.).

retirement benefit equal to 2 percent of his or her salary per year of service, based either upon a percentage of the employee's actual salary at the time of retirement or a percentage of the income cap amount, whichever is lower. As a result of the income cap, the pension benefit received by high income employees could be less than the targeted percentage of their salary.[9]

In 2003, when Spaccia and Pennington were creating the new pension plan, the only person impacted by the income cap was Rizzo. However, Rizzo was adamant that he receive a full 1 percent pension benefit from the new pension plan. In order to provide that benefit, Pennington proposed the creation of two sub-plans within Bell's new pension plan. The first, to be called the supplemental plan, was a qualified plan subject to the income cap, which provided a 1 percent benefit. Employees whose income did not exceed the cap would receive the targeted benefit of an additional 1 percent of their salary. The second plan, to be called the replacement plan, was a non-qualified plan, designed to provide only high income employees with an additional benefit that would bring their total additional pension benefit to 1 percent—i.e., it would replace that portion of the 1 percent benefit eliminated by the supplemental plan's income cap. The city council adopted the supplemental and replacement pension plans on June 30, 2003.

---

[9] For example, if no income cap applied, an employee who earned $300,000 at retirement would receive a 2 percent benefit ($6,000) per year of service from CalPERS, and an additional 1 percent ($3,000) from Bell's supplemental pension plan. However, if an income cap of $200,000 applied, the employee would only receive a benefit of 2 percent of $200,000 ($4,000) per year from CalPERS, and 1 percent of $200,000 ($2,000) per year from the supplemental plan.

Because both the income cap and Rizzo's salary changed annually, it was necessary to adjust the formula used to calculate the replacement benefit periodically to guarantee Rizzo a total benefit equal to 1 percent of his salary. Over the years, Spaccia and Pennington communicated regularly about these calculations. Changes to the pension plan were presented to and adopted by the city council by resolution.

Eventually, Spaccia's salary also exceeded the IRS income cap, and she too was eligible for the replacement plan. Her 2008 employment contract explicitly noted her eligibility for the replacement pension plan. Spaccia's communications with Pennington show she was well aware she would receive the replacement pension plan benefit.

In 2004, Spaccia told Pennington that Rizzo wanted to limit the number of participants potentially eligible for benefits under the replacement plan. She instructed Pennington to develop some limitations to the plan so that only she and Rizzo could receive the benefit. The proposed amendments closing the replacement plan to new participants and requiring participants to have certain dates and years of service were later approved and adopted by the city council by resolution.

Pennington estimated that Bell would need to contribute more than $15 million to fund the replacement plan.

### 3. Employment contracts for Rizzo and Spaccia[10]

#### 3.1. Compensation

When Spaccia first began working at Bell, employment contracts were prepared by Bell's outside counsel, Edward Lee. In 2005, however, Rizzo directed Spaccia to prepare employment agreements for all executive and administrative management employees. She understood that Rizzo planned to submit the 2005 agreements to the city council for approval, together with the five-year budget she was preparing for their review. Rizzo told Spaccia, as well as Garcia, that the 2005 agreements had been approved by the city council.

The employment contracts and subsequent amendments Spaccia prepared provided her, as well as Rizzo, with substantial compensation.

When Spaccia was initially hired as a full-time employee on July 1, 2003, her contract provided a base salary of $3,935 per two week pay period, or $102,310 annually. Pursuant to the agreements and amendments she prepared, Spaccia's salary rose steadily each year. At the time her employment was terminated in 2010, Spaccia earned a base salary of $13,192 per two week pay period—more than $340,000 annually. At trial, Spaccia acknowledged her salary and benefits were excessive.

---

[10] In counts 3 and 4, the jury convicted Spaccia of violating section 424, subdivision (a), regarding Rizzo's compensation and benefits, and Spaccia's compensation and benefits (respectively) during the period 2005 to 2010. In counts 5, 6 and 7, the jury convicted her of conflicts of interest under Government Code section 1090, regarding her 2005 employment contract amendment, 2006 contract amendment, and 2008 contract, respectively.

Rizzo's salary also increased substantially during this period, rising from $9,615 per two week period in 2002 (approximately $250,000 annually) to $27,048 per two week period in 2010—more than $700,000 annually.

Pennington said Rizzo and Spaccia had the highest government salaries he had ever seen.

### 3.2. Fringe benefits

By virtue of their employment contracts and amendments, as well as resolutions adopted by the city council, Spaccia and Rizzo also received significant fringe benefits which, like their salaries, increased substantially over time.

For example, in 2006, the third amendment to Spaccia's employment contract provided that Bell would fund Spaccia's retirement savings plan in the maximum allowable amount. The City paid between $33,000 and $44,000 per year to provide this benefit to Spaccia. Rizzo received the same benefit.

With respect to leave accruals, Bell also provided a substantial benefit. When Spaccia was originally hired, she accrued vacation and sick leave commensurate with her years of employment at Bell, i.e., as a new employee. In 2005, however, the second amendment to her contract provided she would accrue vacation leave commensurate with her years of PERS service credit. As a result, she accrued vacation based upon 15 years of service rather than two years of service—a significant increase. Over time, the city council also approved resolutions that substantially increased vacation and sick leave accruals for Spaccia and Rizzo. At times, Rizzo and Spaccia each received two paychecks—one for their base salary and the other for the cash value of accrued vacation and sick leave. By 2008, Spaccia and Rizzo were earning 33 hours of vacation leave every two weeks.

11

The City also provided increased benefits by purchasing five year PERS service credits for Spaccia, Rizzo, and other senior Bell managers. The purchase of an additional five years of service credit provided employees with increased retirement and leave benefits, to the extent those benefits were calculated using years of service.

Spaccia's 2008 contract also provided that Bell would pay her portion of FICA and Medicare withholding. Eventually, Bell also paid Spaccia's share of the required CalPERS contributions. Rizzo received similar increases and benefits.

**4.    Loans from Bell[11]**

In 2002, the city council authorized an $80,000 loan from Bell to Rizzo. As discussed in greater detail *post*, Rizzo took several additional loans from Bell (without approval from the city council), which he opted to repay using the cash value of his accrued sick and vacation leave. He later expanded this "loan program" to include other employees as well as city council members. Spaccia received six purported loans from Bell, including $77,500 in 2003, $100,000 in 2009, and $130,000 in 2010.

---

[11]    In counts 12 and 13, the jury convicted Spaccia of violating section 424, subdivision (a), by accepting unauthorized loans in 2009 ($100,000) and 2010 ($130,000).

## 5. Employment contract for Randy Adams[12]

In 2009, Rizzo decided to hire a new police chief to improve Bell's police department. Spaccia knew Randy Adams because they worked together for approximately 10 years in the City of Ventura. Adams had a long career in law enforcement and was both well established and well regarded. He had been the Chief of Police in Simi Valley and Glendale. Rizzo asked Spaccia to contact Adams to see if he would be interested in moving to Bell. Adams met with Rizzo and several council members to discuss the possibility, and he eventually agreed to work for Bell.

Over the course of several months, Spaccia met and corresponded with Adams about his salary and benefits package. Adams demanded a high salary because he had planned to retire; to make it worthwhile to work instead of retiring, he asked Bell to pay him the amount of the pension he would have received if he retired in addition to a salary commensurate with his experience. The City ultimately agreed to a salary of approximately $450,000, an amount Spaccia agreed was exceedingly high.

## 6. Scandal erupts; Spaccia is fired, then arrested.

The city council terminated Spaccia's employment with Bell at a council meeting in late July 2010. Spaccia was arrested on September 21, 2010.

---

[12] In count 10, the jury convicted Spaccia of violating section 424, subdivision (a), in relation to the employment contract for Randy Adams.

13

## DISCUSSION

## 1. Substantial evidence supports Spaccia's convictions under Penal Code section 424 regarding unauthorized loans.

Spaccia contends we must reverse the convictions on counts 12 and 13 (§ 424, subd. (a)(2)) because the evidence was insufficient to establish she knew, or was criminally negligent in not knowing, the loans she received from Bell were unauthorized. We disagree.

### 1.1. Standard of review

In assessing the sufficiency of the evidence, we review the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.*) In applying this test, we review the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The testimony of a single witness can be sufficient to uphold a conviction—even when there is significant countervailing evidence, or the testimony is subject to justifiable suspicion. (*People v. Barnwell* (2007) 41 Cal.4th

14

1038, 1052.)  Accordingly, we may not reverse for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### 1.2. Penal Code section 424 requires proof the defendant knew, or was criminally negligent in not knowing, her conduct was unauthorized.

As pertinent here, section 424, subdivision (a), provides: "Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who . . . :

2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law;

[¶] . . . [¶]

Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state."

The "presence or absence of legal authorization is an essential element" of the offense of misappropriation of public funds.  (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 397 (*Stark*).)  "It also a 'fact' about which the defendant must have knowledge in order to act with wrongful intent."  (*Id.* at pp. 397-398.)  Accordingly, the People must establish "either actual knowledge or criminal negligence in failing to know the legal requirements underlying the section 424 charges.  'Criminal negligence refers to " 'a higher degree of negligence than is required to establish negligent default on a mere civil issue.  The negligence must be aggravated, culpable, gross, or reckless.' " [Citations.]' "  (*Id.* at p. 399.)

15

The Supreme Court has long held that "[t]he safekeeping of public moneys has, from the first, been safeguarded and hedged in by legislation most strict and severe in its exactitudes.  It has continuously been the policy of the law that the custodians of public moneys or funds should hold and keep them inviolate and use or disburse them only in strict compliance with the law." (*People v. Dillon* (1926) 199 Cal. 1, 12; *Stark, supra*, 52 Cal.4th at p. 399.)  Accordingly, public officials and others are obligated "to take reasonably necessary steps to determine the appropriateness of their conduct." (*Stark*, p. 402.)  Criminal negligence must "necessarily be measured by what is objectively reasonable for the particular person in the defendant's position." (*Id*. at  p. 401.)

### 1.3.  There is substantial evidence Spaccia was, at a minimum, criminally negligent in not knowing the loans at issue were unauthorized.

Although Spaccia received six loans during the time she worked for Bell, the People only charged her under section 424 with respect to three: a $77,500 loan received in October 2003 (count 11); a $100,000 loan received in February 2009 (count 12); and a $130,000 loan received in March 2010 (count 13).  As noted, *ante*, the jury convicted Spaccia on counts 12 and 13, but deadlocked on count 11, resulting in a mistrial on that count.

The most prominent distinction between the 2003 loan and the 2009 and 2010 loans is, of course, that Bell became a charter law city in 2006.  A copy of Bell's charter was admitted into evidence, and the jury heard testimony from a former attorney for the city, Edward Lee, regarding the impact of Bell's adoption of the charter.  Specifically, Lee explained that the charter vested all power in the city council, unless the charter provided

16

otherwise. In other words, in the absence of an express provision in the charter authorizing a particular action, all proposed city actions needed to be formally approved by the city council through the adoption of an ordinance or resolution, as provided by the charter. The charter does not authorize an employee loan program. Furthermore, the council did not ever pass a resolution or ordinance authorizing such a program.

Although Spaccia repeatedly testified she was unaware the loan program was unauthorized, her subjective view does not preclude conviction under section 424. Spaccia was aware Bell adopted a charter in 2006, and testified she was familiar with certain provisions of the charter, and likely read the charter in its entirety at some point. Moreover, she had worked at municipal and other governmental entities for her entire career—more than 20 years. Given these facts, the jury could reasonably have concluded Spaccia was criminally negligent by failing to take steps to determine whether her 2009 and 2010 loans were authorized either under the Bell charter or by the city council. Accordingly, the convictions on counts 12 and 13 are supported by substantial evidence.[13]

---

[13] As explained *post*, however, we reverse the convictions for those counts due to instructional error.

17

## 2. Spaccia's convictions for misappropriation of public funds under Penal Code section 424 must be reversed due to instructional error.

### 2.1. The court's instructions regarding the elements of the offense of misappropriation of public funds were erroneous.

Spaccia contends her convictions for misappropriation of public funds (counts 3, 4, 10, 12, and 13) must be reversed because the court's instructions regarding the elements of the offense were incorrect as a matter of law. In light of the Supreme Court's recent authority on point, *Hubbard, supra,* 63 Cal.4th 378, we agree the instructions were erroneous.

A criminal defendant has a right to accurate instructions on the elements of a charged crime. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.) ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

18

Section 424 criminalizes conduct by persons charged with receipt, safekeeping, transfer or disbursement of public moneys. Here, the jury was instructed on, and found Spaccia guilty of, five counts of misappropriation of public funds under section 424.[14] Subdivision (a) of that section provides, in pertinent part:

"Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either:

1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another; or,

2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law; [¶] . . . [¶]

Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state."

Spaccia asserts that the court's instructions to the jury—a modified version of CALJIC No. 7.26.1—improperly advised the jury that it could convict her by finding, on the first element of the offense, either that she was an officer of Bell, *or* that she was an employee charged with receipt, safekeeping, transfer, or

---

[14] On counts 3 and 4, the jury found Spaccia violated section 424, subdivision (a)(1), through payment of unauthorized compensation and benefits to Rizzo (count 3) and herself (count 4) during the period July 1, 2005 to June 30, 2010. On count 10, the jury found Spaccia violated section 424, subdivision (a)(1), by facilitating unauthorized payments to Bell Chief of Police Randy Adams between July 28, 2009 and July 2010. On counts 12 and 13, the jury found Spaccia violated section 424, subdivision (a)(2), by accepting unauthorized loans of $100,000 (2009) and $130,000 (2010) from Bell.

disbursement of public moneys.[15]  According to Spaccia, section 424 only applies to those officers who are also entrusted with the receipt, safekeeping, transfer, or disbursement of public funds.

Spaccia relies primarily upon *Hubbard, supra,* a decision issued after her trial which clarifies the scope of liability under section 424.  The Supreme Court granted review in *Hubbard* to consider two questions, the first of which is squarely at issue here: whether section 424, subdivision (a) "applies only to those public officers 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys.' " (*Hubbard, supra*, 63 Cal.4th at p. 386.)

Preliminarily, the court recognized that section 424, subdivision (a), is ambiguous.  The court noted that the first sentence of subdivision (a), "could be read, in short, as applying to (1) all state, county, city, town or district officers, and (2) any person 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys.'  Or it could apply instead to (1) state, county, city, town, or district officers 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys,' and (2) every other person so charged." (*Hubbard, supra*, 63 Cal.4th at p. 386.)  The defendant argued the Legislature's use of the word "other" in section 424, subdivision (a), ("officer . . . and every *other* person charged") implied the Legislature meant only to target officers who are also charged with the receipt, safekeeping, transfer, or disbursement of public moneys.  (*Hubbard, supra,* at p. 387.)  The People argued for a

---

[15]  *Hubbard* was issued after the parties filed their appellate briefs. Pursuant to Government Code section 68081, we requested and received supplemental letter briefs addressing the significance of that decision in this case.

20

more expansive interpretation of the statute, in which *any* government officer could be prosecuted, but only non-officers charged with the receipt, safekeeping, transfer, or disbursement of public moneys would be subject to prosecution.  (*Id.* at pp. 386-387.)

The court acknowledged that both proffered interpretations of the statute were plausible.  However, the court emphasized that in adopting the statute, the Legislature intended to "protect[ ] the public fisc and hold[ ] accountable those in a position to place public funds at risk."  (*Hubbard, supra*, 63 Cal.4th at p. 387.)  After reviewing the statute's text and purpose, as well as its own relevant precedent, the court held "that for a public officer to be convicted under [section 424, subdivision (a)], he or she must be 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys.' "  (*Id.* at p. 391.)  The court went on to conclude that the jury had been properly instructed, and the defendant's conviction was supported by substantial evidence.  (*Id.* at p. 398.)

In light of the court's clarification of the scope of section 424, subdivision (a), in *Hubbard*, we review the instructions given in this case to determine whether they accurately state the elements of the offense of misappropriation of public funds.  The court delivered lengthy instructions based upon CALJIC No. 7.26.1.  As modified, the instruction for counts 3, 4, and 10 read, in pertinent part: "Defendant is accused in Counts Three, Four and Ten of violating section 424, subdivision (a)(1) of the Penal Code, a crime.  [¶]  Every officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who without authority of law,

21

appropriates the same or any portion thereof, to his or her own use, or to the use of another, is guilty of a violation of Penal Code section 424, subdivision (a)(1), a crime.  [¶] . . .[¶]  The term 'officer' includes Chief Administrative Officer and Assistant Chief Administrative Officer for the City of Bell.   [¶] . . . [¶]  In order to prove this crime, each of the following elements must be proved:

1.  The defendant was an officer of the City of Bell, or a person charged with the receipt, safekeeping, transfer, or disbursement of public moneys;

2.  The defendant without authority of law, appropriated public moneys to his or her own use or to the use of another; and

3.  The defendant either knew that the law prohibited her appropriation of public moneys to his or her own use, or to the use of another, or was criminally negligent in failing to discover whether she had the legal authority to make the appropriation."

The court's instruction on counts 11, 12 and 13 was substantially similar, though modified to state a violation of section 424, subdivision (a)(2), rather than subdivision (a)(1).

Our chief concern is that, with respect to the first element of the offense, the instructions state the People needed to prove that Spaccia "was an officer of the City of Bell, or a person charged with the receipt, safekeeping, transfer, or disbursement of public moneys."  Spaccia asserts the use of the word "or," particularly when combined with the comma after "Bell," creates two alternative classifications, either of which would be sufficient to sustain a conviction: (1) officers of Bell; and (2) persons charged with the receipt, safekeeping, transfer or disbursement of public moneys.

The People flatly reject the possibility that the instructions may have led the jury to believe it could convict Spaccia without

finding she was charged with the receipt, safekeeping, transfer or disbursement of public moneys.  The People contend "[a]s a matter of plain English, the jury would have understood that the 'charged with' clause modifies both the words 'person' and 'officer.' "  The "plain English" rule the People focus their argument upon is the last antecedent rule—a rule of statutory interpretation which "provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' "  (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 (*White*).)

Here, applying the last antecedent rule produces the construction urged by Spaccia: the phrase "charged with" modifies only the immediately preceding word, "person," and does not modify "an officer of the City of Bell."  However, the People argue an exception to the last antecedent rule applies: " ' "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." ' "  (*White, supra*, 31 Cal.3d at pp. 680-681.)  By applying this exception, the People propose, the first element of the instructions should be read as if it stated " '[t]he defendant was an officer of the City of Bell [charged with the receipt, safekeeping, transfer, or disbursement of public moneys,] or a person charged with the receipt, safekeeping, transfer or disbursement of public moneys."  This interpretation would cure the defect in the instructions alleged by Spaccia.

Even if we were to assume that it is useful to apply a rule of statutory construction in the analysis of a jury instruction—a matter open to debate—we are not persuaded by the People's

23

position. Instead, we focus our analysis on the common and accepted use of "or" as a disjunctive. (See Chicago Manual of Style (16th ed. 2010) p. 255, § 5.198 ["[d]isjunctive or separative coordinating conjunctions denote separation or alternatives. Only one of the statements joined by the conjunction may be true; both may be false. The conjunctions include . . . or"].) Thus, in the instruction given here ("the defendant was an officer of the City of Bell, *or* a person charged with the receipt, safekeeping, transfer or disbursement of public moneys"), the conjunction "or" separates two distinct alternatives: officers, on one hand, and persons charged with financial responsibility, on the other hand. The placement of the comma before "or" further emphasizes the distinction. We believe this straightforward application of basic grammar principles yields the construction most likely understood by the jurors.[16]

Accordingly, and consistent with the reasoning of *Hubbard*, we hold the instructions given in this case—and the CALJIC pattern instruction upon which they were based—improperly state the first element of the offense of misappropriation of public funds under section 424, subdivision (a), because they allowed the jury to convict Spaccia based upon a finding that she was a

---

[16]    Our grammatical analysis is consistent with long standing as well as contemporary usage of the word "or." (See, e.g., Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of Punctuation in the Constitution* (2012) 79 Tenn. L. Rev. 687, 727, fn. 192 [examining use of conjunctions and commas in the Constitution, and observing contemporary usage accurately explained by *Schoolhouse Rock! Conjunction Junction* (ABC television broadcast Nov. 17, 1973), which instructs that "or" is a conjunction used to connect words and phrases "when you have a choice"].)

24

city officer, without also finding she was charged with the receipt, safekeeping, transfer or disbursement of public moneys.

### 2.2. The error was prejudicial.

As the People point out, the court properly instructed the jury it could convict Spaccia either because she committed the crimes charged, or because she aided and abetted the perpetrator of those crimes.[17]  Thus, the jury was presented with three theories upon which it could convict Spaccia of misappropriation of public funds: (1) she was an officer of Bell who made unauthorized use of public funds; (2) she was a person charged with the receipt, safekeeping, transfer or disbursement of public moneys who made unauthorized use of public funds; and (3) she aided and abetted someone else (in this case, Rizzo) in the commission of the crime.  The first of these theories is, as just explained, invalid as a matter of law.

The People urge us to affirm Spaccia's convictions under section 424, notwithstanding the instructional error, because "there was a mountain of evidence that [Spaccia] was responsible for supervising the safekeeping, transfer, and disbursement of public moneys throughout her tenure" at Bell.  In the alternative, the People argue the court's instructional error was not

---

[17]    The court gave CALCRIM 400: "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.  [¶]  Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

25

prejudicial because the jury could have convicted Spaccia on the aiding and abetting theory, which theory the People assert is supported by "strong evidence."  Evidently, the People misunderstand the analysis of prejudice where, as here, the jury is instructed on multiple theories of a defendant's guilt, and one of those theories is legally inadequate to sustain the conviction.

"The nature of this harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory.  When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' [citation], the jury cannot reasonably be expected to divine its legal inadequacy.  The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime.  In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' [Citation.]

"In contrast, when one of the theories presented to a jury is factually inadequate, such as a theory that, while legally correct, has no application to the facts of the case, we apply a different standard.  [Citation.]  In that instance, we must assess the entire record, 'including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.' [Citation.]  We will affirm 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' [Citation.]" (*People v.*

26

*Perez* (2005) 35 Cal.4th 1219, 1233 [quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1130].)

Here, we must reverse the convictions on counts 3, 4, 10, 12 and 13, unless we conclude, beyond a reasonable doubt, the jury based those convictions on a finding that Spaccia had the requisite control over public funds, or found she aided and abetted Rizzo in the commission of the charged crimes, or that the instructional error was harmless. (See *Neder v. United States* (1999) 527 U.S. 1, 19 [holding if defendant presented evidence sufficient to support a contrary finding on an omitted element, error is not harmless beyond a reasonable doubt]; *People v. Chun* (2009) 45 Cal.4th 1172, 1203 [noting if other aspects of the jury's verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for the legally valid theory, the error is harmless]; see also *People v. Chiu* (2014) 59 Cal.4th 155, 167 [holding defendant could not be convicted of first degree murder on natural and probable consequences theory, and then noting "[d]efendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder"].) We find no evidence on this record which would allow us to draw any of those conclusions.

First, the jury's verdicts on the misappropriation counts were general verdicts, and thus the jury was not required to state the theory underlying the verdicts. Further, with the exception of the verdict on count 1 (conspiracy to misappropriate public funds), nothing about the verdicts on the remaining counts indicates, one way or the other, which theory formed the basis of the jury's verdicts. And as to count 1, the People set forth 23

27

overt acts related to the conspiracy; some relate to the conduct underlying counts 3, 4, 10, 12 and 13, but others do not.  The jury's verdict stated only that it found Spaccia "committed at least one" of those 23 acts, and the verdict form did not require the jury to specify which act(s) formed the basis of the conviction for count 1.  Moreover, the jury was instructed that it did not need to agree on which overt act formed the basis of the conspiracy conviction, so long as each juror concluded that at least one of the 23 alleged overt acts was committed.

We note the jury found true the special allegation that the crimes charged in counts 3, 4, 12, and 13, involved the theft of over $100,000 within the meaning of section 12023.045, subdivision (a).  The jury was instructed, in pertinent part, "[t]o prove this allegation, the People must prove that: 1. The City of Bell entrusted public money to the defendant; 2. The City of Bell or its agents did so because it or they trusted the defendant[;] 3. The defendant fraudulently used the property for her own benefit; 4. When the defendant used the public money, she intended to deprive the City of Bell of its use; and 5. The public money was over $100,000."  In accordance with long standing precedent, we presume that the jury understood and followed the court's instructions.  (See, e.g., *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

Spaccia contends the finding of entrustment embraced by the special allegation is not synonymous with a finding under section 424 that she was " 'charged with the receipt, safekeeping, transfer, or disbursement of public moneys.' "  In support of her argument, Spaccia notes that the jury instructions regarding misappropriation of public funds (the modified CALJIC pattern instruction discussed *ante*) contain the following language: "An

28

officer or a person is charged with the receipt, safe keeping, or disbursement of public moneys when he or she is entrusted with responsibilities or duties relating to, and has some degree of control over, the receipt, safe keeping, or disbursement of public moneys." Spaccia argues this portion of the section 424 instructions requires the jury to make two findings: entrustment of public moneys, and a degree of control over those public moneys, only the first of which is encompassed within the jury's finding on the special allegation. We agree, particularly in light of the fact that the heart of Spaccia's defense on these counts was that although she was entrusted with public funds—the finding the jury made in the special allegation—she was not in a position to exercise control over those funds.

Second, some courts have been able to determine the basis of the jury's verdict by examining questions posed by the jury during its deliberations. (See, e.g., *People v. Chiu, supra,* 59 Cal.4th at pp. 167-168 [discussing note from jurors indicating they could not agree whether to convict on first- or second-degree murder].) Here, the jury did ask several questions during the course of its deliberations. Those questions, however, do not shed any light on the basis of the jury's convictions on the counts at issue. We therefore conclude the jury's verdicts and questions do not indicate which theory the jury relied upon to convict Spaccia under section 424.

We see no other indication from the conduct of the trial which suggests, one way or the other, which theory of guilt the jury adopted. During closing argument, the People focused upon the invalid theory of guilt more than the other two theories. (See, e.g., *People v. Valentine* (2001) 93 Cal.App.4th 1241, 1246, disapproved on another point by *People v. Leal* (2004) 33 Cal.4th

29

999 [observing the potential prejudice from an instructional error is increased where the prosecutor's argument focuses on the erroneous theory].) Indeed, the People emphasized to the jury that it could convict Spaccia if she was an officer of Bell. At one point during his closing, for example, the prosecutor addressed the misappropriation counts, saying: "Misappropriation. You have to either be an officer or a person charged with disbursement of public funds. An officer. Right. The way she becomes an officer is if she is the assistant chief administrative officer. You saw that listed in the city charter." He highlighted the distinction between officers and employees as well: "Now even if you are not a public officer, the second thing you are still liable for is 424. Employees are too, if they are entrusted with responsibilities or duties relating to and have some degree of control over the receipt, safekeeping or disbursement of public funds."

Moreover, the aiding and abetting theory went virtually unmentioned during the People's initial closing and rebuttal arguments. During his initial argument, the prosecutor barely alluded to the theory. After summarizing evidence relating to Adams's hiring, the prosecutor suggested the evidence showed Spaccia and Rizzo conspired to conceal his salary and other benefits. He then stated, "And you got instructed on the law of conspiring and aiding and abetting. And that's what covers it," and moved on to other matters. During rebuttal, the prosecutor mentioned aiding and abetting directly, but only with respect to count 3, relating to Rizzo's salary and benefits. "We have charged her with aiding and abetting and assisting Mr. Rizzo in stealing his own salary. Mr. Rizzo obviously couldn't do it all by himself; he needed people to help him. Miss Spaccia is one of the

30

people that helped him." Aside from these two remarks, the People focused on Spaccia acting in her own self-interest, either on her own or in concert with Rizzo.

In sum, the People did not establish that the jury necessarily convicted Spaccia because it found she had a material degree of control over public funds, or because she aided and abetted Rizzo in the commission of the charged crimes.

Nor can we determine, through examination of the evidence, that the jury relied on one of the legally correct theories in rendering its verdicts. If no reasonable jury could have found in Spaccia's favor on the invalid theory due to a lack of substantial evidence, the error would be harmless. But that is not the case here. Instead, there was evidence from which the jury could have found Spaccia guilty on the legally invalid theory and rejected the valid theories. As we discuss in detail *post,* Spaccia presented evidence to support a finding that she did not have a material degree of control over the public funds at issue in counts 3, 4, 10, 12 and 13. Spaccia's testimony (which was corroborated to some extent by other witnesses), if credited by the jury, provides a sufficient basis for a finding in her favor on all of the misappropriation counts.

*Counts 3 and 4*

In counts 3 and 4,[18] the jury convicted Spaccia of misappropriating public funds through employment contracts for Rizzo and herself throughout the period July 1, 2005 through June 30, 2010.

---

[18]    Because we conclude the conviction on count 4 must be reversed due to instructional error, it is unnecessary for us to address Spaccia's

Spaccia testified she acted only in a secretarial capacity with respect to employment contracts for herself, Rizzo, and other members of Bell's executive management. All pertinent information regarding the contract terms came from Rizzo, and she had no authority to make any decisions about or changes to the employment agreements.

In 2005, Spaccia prepared 12 employment contracts for management level employees at Bell. She used her own contract as a template and created new contracts by filling in the detailed information contained in a spreadsheet she received from Rizzo. Rizzo told her he would, and did, present the contracts to the city council for approval. She had no contact with the council members, per Rizzo's direction. In 2006, Rizzo directed her to revise those contracts by adding a severance clause and making a change to the medical reimbursement provision. Although Spaccia would sometimes sign personnel action reports advising the payroll department of a change in compensation for an employee, she did so only after talking with Rizzo and then signed on his behalf, not her own.

Spaccia's testimony was confirmed to some extent by Garcia, who testified Rizzo (not Spaccia) would inform her of changes to his or Spaccia's employment contracts. In addition, Garcia confirmed Rizzo (not Spaccia) instructed her to prepare the 2007 and 2008 city council resolutions which implemented increased accrual rates for sick and vacation leave designed to benefit himself and Spaccia.

---

contention that the court should have stayed sentencing on counts 5, 6 and 7 under section 654.

*Count 10*

In count 10, the jury convicted Spaccia of misappropriating public moneys from July 2009 to July 2010 through "payment made to Randy Adams pursuant to a contract for $457,000 per year as Chief of Police unlawfully executed in violation of Bell City Charter sections 519 and 604(a) and Resolution 2006-42." In the People's view, Spaccia exercised control over public monies by virtue of her role in the negotiation and finalization of the inflated employment contract for Adams.

According to Spaccia, however, Rizzo made all the decisions regarding Adams's contract. Adams also understood Spaccia was delivering messages from Rizzo and was acting at his direction.

Spaccia testified at trial that when Rizzo was considering police chief candidates, he asked her to reach out to Adams, who was then the Chief of Police in Glendale. Spaccia knew Adams because she worked with him in the City of Ventura from 1980 to 1990. Spaccia considered Adams to be a "professional friend." When Spaccia contacted Adams, she told him Rizzo asked her to reach out to him about the police chief job in Bell.

According to Spaccia, Rizzo arranged a series of meetings for Adams to meet the council members, managers, and the president of the police officer's association. She attended some, but not all, of those meetings. Rizzo eventually told Adams that he could "write [his] own ticket." Negotiations began after Adams sent Rizzo his request for salary and benefits. Rizzo reviewed Adams's requests with Spaccia, told her which benefits Bell would provide, and then asked her to relay that information to Adams. Rizzo explicitly instructed Spaccia not to discuss salary with Adams; Rizzo said he would handle that with Adams directly.

33

Although Spaccia drafted the employment agreement for Adams, she maintained she had no control over its content. Rizzo decided which benefits Adams would receive and told her the salary to put into the contract. When the Adams employment contract was finalized, Spaccia took the agreement to Glendale so Adams could sign it. Rizzo, not Spaccia, signed the contract on behalf of Bell. Spaccia did not sign the personnel form authorizing Adams's pay.

*Counts 12 and 13*

In counts 12 and 13, the jury convicted Spaccia of misappropriating public funds by accepting unauthorized loans from Bell in the amount of $100,000 (February 2009) and $130,000 (March 2010), respectively. Although Spaccia does not deny she received the money from Bell, she contends these loans were part of an "administrative loan" program devised by Rizzo and administered by Garcia, as to which she exercised no authority or control. Her testimony at trial supports her position, as does the testimony of Garcia.

According to Garcia, the 2002 amendment to Rizzo's employment agreement provided that Rizzo could borrow $80,000 from Bell. After Rizzo received, and repaid, the $80,000 loan, he told Garcia he could take another loan in the same amount. Over the next several years, he took at least six loans from Bell in varying amounts. Rather than repay the loans with deductions from his salary, Rizzo repaid them with the cash value of his accrued sick and vacation leave.

Rizzo subsequently authorized similar loans for other Bell employees. In 2003, Spaccia received a loan of $77,500, to be repaid with the cash value of sick and vacation leave. Rizzo told Garcia he authorized the loan for Spaccia. Although the evidence

was conflicting about who drafted the agreements relating to the loans, the jury could have credited Spaccia's testimony that she had no involvement in the preparation of those agreements. Garcia also testified that Rizzo encouraged her to take a loan from Bell, which she did.

With respect to the loans at issue in this appeal, Garcia instructed Bell's accounting department to wire $100,000 to Spaccia in February 2009.  Rizzo approved the wire transfer request.  It is unclear whether any written agreement was ever prepared for this loan.  Spaccia also received a loan of $130,000 in March 2010.  Rizzo authorized the wire transfer.  Spaccia denied preparing or authorizing any aspect of these two loans and consistently stated Rizzo was the only person authorized to approve loans to Bell employees.

In light of the state of the evidence, as well as the other factors we have discussed, we cannot conclude that the jury necessarily convicted Spaccia on one of the two legally valid theories, as opposed to the legally invalid one, or that the jury's verdicts on counts 3, 4, 10, 12 and 13 would have been the same notwithstanding the instructional error.  We therefore must reverse the five convictions under section 424.

3.    **The conviction under Government Code section 1090 based upon changes to Bell's pension plan must be affirmed.**

Spaccia contends her conviction on count 2 must be reversed because the People failed to prove that the alleged conflict of interest (which involved the formation or modification of Bell's supplemental and replacement pension plan program) concerned a contract.  In the alternative, Spaccia contends she cannot be convicted in count 2 for having made the same

contracts (her employment agreements and addenda) underlying her convictions in counts 5, 6, and 7. Because the changes to the pension plan effectively amended Spaccia's employment contract, and her participation in the modification of the pension plan involves different conduct than is at issue in counts 5, 6, and 7, we affirm the conviction on count 2.

### 3.1. The existence of a contract is a required element of the crime of conflict of interest under Government Code section 1090.

In count 2, Spaccia was convicted of a conflict of interest under Government Code section 1090, which provides in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." (Gov. Code, § 1090, subd. (a).) Under Government Code section 1097, "[e]very officer or person prohibited by the laws of this state from making or being interested in contracts . . . , who willfully violates any of the provisions of those laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state." (Gov. Code, § 1097.)

As the Supreme Court recently observed, Government Code section 1090 "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).) "The common law rule and section 1090 recognize '[t]he truism that a person cannot serve two masters simultaneously . . . .' [Citations.]" (*Id*. at p. 1073.)

36

"To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests.  [fn. omitted]  [Citations.]  Proof of a violation of section 1097, the provision criminalizing violations of section 1090, requires a further showing that the section 1090 violation was knowing and willful.  [Citations.]" (*Lexin, supra*, 47 Cal.4th at p. 1074.)

Of particular relevance here, the Supreme Court has emphasized that "[w]hat differentiates section 1090 from other conflict of interest statutes such as the Political Reform Act of 1974 . . . is its focus on the making of a *contract* in which one has an impermissible interest." (*Lexin, supra*, 47 Cal.4th at p. 1074 [original italics], citing *People v. Honig* (1996) 48 Cal.App.4th 289, 333 (*Honig*).)  Thus, Government Code "[s]ections 1090 and 1097 are more specific than the conflict-of-interest provisions of the [Political Reform Act of 1974, Government Code § 8100 et seq. (PRA)].  The former specifically apply to the making of governmental contracts while the latter apply to making, participation in making, or in any way attempting to use an official position to influence, any governmental decision. (§ 87100.)  While the definition of making a contract is defined broadly under section 1090, it is not nearly as broad as the behavior at which the conflict-of-interest provisions of the PRA are aimed.  [Citation.]" (*Honig, supra*, 48 Cal.App.4th at p. 329.)

### 3.2. The modification of Bell's pension plan effectively amended Spaccia's employment contract.

The jury convicted Spaccia of four conflicts of interest under Government Code section 1090: count 2 (Bell supplemental and replacement pension benefit program), count 5 (2005 second addendum to her employment agreement), count 6 (2006 third addendum to her employment agreement), and count 7 (2008 employment agreement). Spaccia challenges only the conviction on count 2.

Spaccia contends her conviction on count 2 is impermissibly based upon the same conduct at issue in counts 5, 6, and 7, which alleged conflicts of interest based upon her employment contracts and addenda in 2005, 2006 and 2008. Fundamental to her argument is her assertion that the Bell supplemental and replacement plan program (identified as the basis of count 2 by the People) is not, in and of itself, a contract. Rather, she suggests, the right to pension benefits is part of the consideration provided by Bell to its employees as part of the employment relationship and, therefore, her pension benefit is encompassed within her employment contracts. Although Spaccia's position is, to some extent, consistent with well-established law, it does not lead to the conclusion she urges.

We agree that Spaccia's right to pension benefits constituted compensation incident to her employment with Bell. "[I]t has long been settled that under California law [pension] benefits 'do not derive from the beneficence of the employer, but are properly part of the consideration earned by the employee.' [Citation.] Since pension benefits represent a form of deferred compensation for services rendered [citation], the employee's

38

right to such benefits is a contractual right, derived from the terms of the employment contract.  Since a contractual right is not an expectancy but a chose in action, a form of property [citations], we held in *Dryden v. Board of Pension Commrs.* [1945] 6 Cal.2d 575, 579, that an employee acquires a property right to pension benefits when he enters upon the performance of his employment contract." (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 845; see also *In re Marriage of Peterson* (2016) 243 Cal.App.4th 923, 929-930.)

Moreover, for a public employee like Spaccia, the right to pension benefits is a vested, contractual right.  "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment.  Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity.  [Citation.]" (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863.)  Here, however, we depart from Spaccia's logic.  Because the right to pension benefits vests "upon acceptance of employment," it necessarily follows that any modification of a pension benefit during employment constitutes an amendment to the employee's terms of employment.  In other words, a change in pension benefits effectively amends the employee's contract of employment by changing the amount of the employee's compensation, and the employee ratifies the amendment by continuing the employment relationship.  An amendment to or renegotiation of a contract, like the formation of a contract, falls within the scope of Government Code section 1090.  (See, e.g., *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 304 [collective bargaining

39

agreements are binding contracts]; *City of Imperial Beach v. Bailey* (1980) 103 Cal.App.3d 191, 196-197 [renewal of concessionaire contract constitutes "making" of a contract for purposes of section 1090].)[19]

Further, in assessing the extent to which Spaccia benefited from amendments to Bell's pension plan, we are not limited to an examination of written employment contracts. "[P]rohibited financial interests are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances." (*People v. Honig* (1996) 48 Cal.App.4th 289, 315.) " '[W]e must disregard the technical relationship of the parties and look

---

[19] The Attorney General has also repeatedly found that the modification of a contract falls within the scope of actions prohibited by Government Code section 1090. (See, e.g., 89 Ops.Cal.Atty.Gen. 217, 218-219 (2006) [renegotiation of collective bargaining agreement constitutes "making" of a contract within the meaning of section 1090]; 81 Ops.Cal.Atty.Gen. 134, 136-137 (1998) [renegotiation of rental agreement and water fee constitutes "making" of a contract]; 73 Ops.Cal.Atty.Gen. 191, 193-194 (1990) ["obvious" conflict arises for school board member who is also a teacher within the district when board makes decisions regarding teacher salaries]; 65 Ops.Cal.Atty.Gen. 305, 307 (1982) [modification of collective bargaining agreement by school district's governing board constitutes the making of a contract within the meaning of section 1090].) Although not binding, "Attorney General opinions are entitled to considerable weight. [Citation.] This is particularly true when construing section 1090 and its related provisions because 'the Attorney General regularly advises local agencies about conflicts of interest and publishes a manual designated to assist local governmental agencies in complying with the conflict of interest statutes.' " (*Lexin, supra,* 47 Cal.4th at p. 1087, fn. 17.)

behind the veil which enshrouds their activities in order to discern the vital facts.  [Citation.]  However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established.' [Citation.]" (*Ibid*.)  Accordingly, we examine the circumstances surrounding the modification of the pension plan to determine whether Spaccia's conduct falls within the scope of Government Code section 1090.

Here, the timing of the pension plan modifications as related to the negotiation of Spaccia's employment contracts and subsequent amendments is critical.  Bell created the supplemental and replacement pension plans effective July 1, 2003.  On the same date, Spaccia became an employee of Bell.  However, at that time Spaccia's salary ($102,310 annually) was below the ERISA income cap and therefore she did not benefit from any aspect of the replacement plan.  In 2004, by resolution 2004-48, the city council approved an amendment to the replacement plan, increasing the multiplier to 5 percent (which had the effect of increasing the retirement benefit for participants in the replacement plan), effective July 1, 2005.  The second amendment to Spaccia's employment contract, also effective July 1, 2005, increased her salary to $185,000 annually, an amount above the ERISA income cap.  Thus, by that time, Spaccia plainly had a financial interest in the replacement plan.

In late 2007, Pennington advised Spaccia that the ERISA income cap amount would be increased from $150,000 to $230,000 in 2008.  Accordingly, the formula used to calculate the benefit for the replacement plan needed to be modified in order to ensure that Rizzo would receive the targeted benefit amount (1 percent of his salary per year of service, from the supplemental

41

and replacement plans combined). Spaccia and Pennington exchanged multiple email messages concerning the details and financial projections, and they eventually arrived at a solution. By resolution 2007-63, the city council approved an amendment to the replacement plan increasing the multiplier to 5.175 percent, effective January 1, 2008. As of January 1, 2008, Spaccia's employment contract provided that she earned more than the ERISA income cap. Thus, when the pension plan modification became effective on January 1, 2008, Spaccia's employment contract was effectively amended because, as of that date, she gained a vested right to increased pension benefits. Viewing the transaction as a whole, it is plain that Spaccia acted on Bell's behalf to determine the extent to which the pension benefit needed to be increased in order to fulfill Bell's commitment to Rizzo. At the same time, as an employee, she benefitted directly from that increase because she was a participant in the replacement plan. This conduct is sufficient to support Spaccia's conviction for conflict of interest on count 2.

## DISPOSITION

The convictions on counts 3, 4, 10, 12 and 13 are reversed. The judgment of conviction is affirmed in all other respects. The matter is remanded for further proceedings consistent with this opinion, including correction of the abstract of judgment to delete references to Spaccia's current or prior serious or violent felony convictions.

## CERTIFIED FOR PARTIAL PUBLICATION

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ALDRICH, J.

43