Filed 8/29/23  P. v. Meza CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO MEZA,<br><br>    Defendant and Appellant. | E077952<br><br>(Super.Ct.No. RIF1904071)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge. Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

1

## INTRODUCTION

Defendant Armando Meza appeals from a conviction and sentence of 26 years to life for first degree murder, including an enhancement for use of a knife, flowing from an incident at Lincoln Park in Riverside, California. After a disagreement about whether the victim, Phillip Bucks, could sit in a particular area of the park, the victim challenged defendant and a fight took place, during which defendant pulled a knife and stabbed the victim multiple times.

On appeal, defendant argues (1) there is insufficient evidence of premeditation to support the conviction for first degree murder, (2) the court's instructions on provocation were misleading, (3) defense counsel rendered ineffective assistance of counsel in failing to request a pinpoint instruction on provocation, (4) the prosecutor committed misconduct during rebuttal in summation to the jury and counsel was ineffective for failing to object to the misconduct, (5) the court erred in instructing the jury that defendant could not claim self-defense if he provoked the altercation and defense counsel was ineffective for failing to object to the instruction, (6) defense counsel was ineffective for failing to move for a mistrial after two jurors had to be excused and replaced by alternatives due to Covid-19, and (7) the cumulative effect of the various alleged errors requires reversal. We affirm.

## BACKGROUND

Because there were varied accounts of the incident leading to the murder, we examine each. On September 28, 2019, Tony Arevalo and Juan Jerez, also known as

2

"Flaco," were at Lincoln Park, preparing to barbecue. Tony was a friend of defendant, Armando Meza, and had known him for four to five years. At some point, Tony became aware that defendant was involved in an argument, but did not pay much attention until they started fighting or wrestling. When Tony first noticed the argument, the victim, "the big guy," was on the sidewalk and defendant was by the bench a few feet from Tony. Tony referred to the victim as a "big guy" because the victim was much larger than either defendant or Tony, who are both short.[1] Defendant was yelling at the victim to "get out of here," indicating that "this is Mexican territory."

The victim, a white man, was cursing at the defendant, and walked from the corner towards defendant, and charged at the defendant. Then Tony saw the victim start wrestling; he grabbed the defendant, bullied him, and threw him on the ground. The victim was the first person to lay hands on defendant and appeared to be the aggressor. The victim pushed defendant, described by Tony as a "body slam," causing defendant to fall back on his behind. Then defendant tripped the victim, and lost control. Tony saw defendant's hands go fast but did not know if defendant had a knife or a needle or something in his hands, though he saw blood coming out. Then the victim got up and Tony saw that his chest was bleeding. At this point, Tony left.

Tony did not recall defendant making any statements to the victim about "gringos," but did hear defendant say that this was Mexican territory. Tony did not see any weapons and did not realize what was going on until after the victim was hurt. He

---

[1] At the autopsy, the victim's height was recorded as 6 feet, 2 inches, and his weight was 219 pounds.

denied covering up for the defendant, but admitted that in a prior statement to police, he told a detective that defendant tripped the victim and started smacking the victim, at which point Tony saw a blade with which defendant started stabbing the victim.

Juan Jerez, called "Flaco," lived near the park in a house in the back yard of a residence, but occasionally slept in an empty lot on Fourteenth Street, or Lincoln Park, where he had several friends, including defendant, an individual called Enrique, and "Nacho." Juan had known defendant since the 1990's in Santa Ana, but had been friends with defendant only within the past five or so years. He hung out at the park with defendant, where he could barbecue meals for himself, and others, including defendant and Tony Arevalo. Juan was aware that defendant had an abdominal scar from a recent surgery, which he had seen a few days before the incident of September 28, 2019. However, defendant's mobility did not seem to be impacted and he did not complain of pain from the wound.

On September 27, 2019, Juan met the victim, who was pushing a cart, when the latter asked Juan about staying in the park. Juan advised him to find a place and stay put. The next day, in the morning, Juan went to the park where Tony, Enrique, and Nacho were. Defendant had a girlfriend named Grace, and he liked to sit on the steps of a house on Park Avenue with her, or around the trees. At about 10:30 a.m., the victim walked towards the tables where everyone was sitting, yelling about being kicked off the steps, that defendant had told him to get out of there because he was waiting for his girlfriend there. The victim said he had already called the police. Defendant was not there yet.

4

Juan suggested that the victim wait at that location for the police to show up, so they would not check the rest of the group. Then Juan and his friends moved to another table, approximately 40 feet away.

Later, defendant arrived from the store with beer, and mentioned the encounter with the victim at the steps. Juan suggested that defendant go and apologize to the victim in the hopes that the victim would cancel the call to the police. By this time, Nacho and Enrique had left because they did not want to get involved with the police. At the barbecue, Tony and defendant gave Juan some money to purchase some meat. At this time, the victim was sitting at the other table, yelling stuff to defendant's group about the police coming. Defendant did not say anything. However, Juan knew defendant was upset or angry at the victim for sitting in the spot where defendant normally sat with his girlfriend. Juan assumed defendant was angry because he used to get mad at other people when they would sit in that spot.

When Juan returned from the store, he asked the victim if the police had come, but the victim told him to shut up, so Juan went back to the table where defendant and Tony were, with the meat he had purchased. Juan again suggested that defendant apologize to the victim because the police would check them out again. Defendant then got up and walked towards the victim, followed by Tony. Juan heard defendant tell the victim to call the cops, and, when defendant got within 15 feet of the victim, the victim removed his shirt, wrapped it around his fist, and got into a boxing stance as defendant approached. Defendant continued to approach him as the victim taunted him to come on.

5

The victim yelled at everyone in the group, calling them "beaners" and other derogatory names.

The victim threw the first punch at defendant, but defendant ducked away, causing the blow to miss him, but causing defendant to fall to the ground when he ducked. Then the victim grabbed defendant by the shoulders and shook him back and forth. Defendant elbowed the victim, causing the victim to fall back on the ground. Then defendant pulled something from his waist area, had his hands on the victim's chest, and the victim fell to the ground with defendant on top. Juan saw the defendant "pushing" the victim in the chest, moving his hands up and down against the victim, as the victim tried to grab defendant's hand to push him off, but Juan did not see a knife.

Then, defendant got up, and the victim went to sit at the table, bleeding from the chest area. Juan and his friends left the park to avoid getting into trouble.

At the time of the incident, Francisco Rivera happened to stop at a stop sign at the intersection of Park Avenue and Fourteenth Street, when he saw a person lying on the grass, wearing shorts and no tee-shirt, while a second person was on top of him, making up and down motions with his hands, as if stabbing. The man making the stabbing motions was cursing at the victim and appeared angry. A third person was watching, and appeared to have mental issues. He parked his truck at Park and Twelfth Street and walked to the corner to see what was happening; Rivera could see defendant now standing on the side, and the victim sitting on a picnic bench; the victim appeared to be

6

having difficulty breathing. He also noted that the victim had blood stains in the area of his trunk or torso and on his back.

Rivera did not see any of the incident that led up to the stabbing. Afterwards, however, the defendant seemed aware Rivera had parked and started walking towards Rivera's parked truck and made a movement, which is when Rivera saw his face and hair: defendant appeared to be dirty, like a homeless person. Rivera told his nephew to call 911. In court, Rivera was unable to identify defendant because his appearance was different.

Police were dispatched regarding the report of two subjects fighting in the park at approximately 1:20 p.m. Upon arrival, they saw a male subject in the middle of the park, lying face down. The victim, shirtless and wearing shorts, was nonresponsive and had no pulse. Upon the arrival of the fire department and ambulance, the victim was turned over, revealing multiple stab wounds.

Later that day, while detectives were en route to Tony's Market, located near the park, they encountered defendant who was walking towards them with Frankie Ramirez. When detectives asked defendant if he was Armando Meza, he initially denied it, but when they checked his identification, it reflected his true identity. With the aid of a Spanish language interpreter, the detectives interviewed defendant and he was arrested.

Detectives also received information that defendant had tossed the knife used in the murder and sent another detective to retrieve it. The knife that was found had traces of suspected blood on it, which later confirmed it was the murder weapon, due to the

presence of DNA from both the victim and defendant. The defendant's clothing bore evidence of the victim's DNA.

Pretrial statements of the trial witnesses to detectives also varied in their accounts from their sworn testimony. Tony Arevalo stated defendant yelled at the victim about Mexican territory before the victim went to the corner, but the victim was quiet and did not engage. While Tony did state in a pretrial interview that the victim had approached the defendant, he did not, at that time, describe the victim as "charging at" the defendant.

When Juan Jerez was interviewed pretrial, he initially mentioned only a fight and did not mention a stabbing. In a second interview, Juan indicated that the defendant was not at the park at the same time the victim was there. He pretended to not know anything about the stabbing but offered to help the police find someone who knew something. In the third contact, Juan offered to help detectives locate evidence and find witnesses. In their last contact, detectives told Juan it was serious, that the victim had died, and Juan finally stated that defendant had "lost it" or "lost his cool," because the victim was yelling at them about being wetbacks. At this point, Juan informed detectives that defendant came up from behind the victim and started fighting with the victim. The first time Juan mentioned advising defendant to apologize to the victim was at the preliminary hearing.

At the autopsy, the pathologist identified an injury to the victim's larynx, including a fracture of the thyroid cartilage. The victim sustained six stab wounds altogether on his torso and chest area as well as two wounds on the back of his right arm.

The stab wounds on the chest area were the most serious, where one wound punctured the left pulmonary vein causing significant blood loss, while another pierced the sternum and hit the middle of the heart. The cause of death was attributed to stab wounds of the torso in addition to blunt force injury to the neck.

Defendant was charged by information with one count of murder, in violation of Penal Code section 187, subdivision (a),[2] with an allegation that in the commission of the murder he personally used a deadly weapon, to wit: a knife, pursuant to section 12022, subdivision (b)(1). Following a jury trial, defendant was convicted of murder in the first degree, upon the jury's finding the murder was deliberate and premeditated. The court sentenced defendant to 25 years to life for the murder, in addition to a one-year enhancement for the knife use allegation, for a total sentence of 26 years to life in prison.

On October 22, 2021, defendant timely appealed.

**DISCUSSION**

1.     *Substantial Evidence Supports the Findings of Premeditated and Deliberate Murder.*

Defendant argues there is insufficient evidence to support the findings that the murder was willful, deliberate, and premeditated. We disagree.

The standard of review was recently capsulized by the California Supreme Court: "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to

_____

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

9

determine whether it contains substantial evidence - that is, evidence that is reasonable, credible, and of solid value - from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court "'''presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is first degree murder. (§ 189, subd. (a).) "'''In this context, "premeditated" means "considered beforehand," and "deliberate" means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"' [Citations.]" (*People v. Morales*, *supra*, 10 Cal.5th at p. 88.) "'''An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027; see also *People v. Anderson* (1968) 70 Cal.2d 15, 24–34 (*Anderson*).)

10

"'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" (*People v. Potts, supra,* 6 Cal.5th at p. 1027, citing *People v. Thomas* (1945) 25 Cal.2d 880, 900.)

In *Anderson, supra,* the California Supreme Court observed that "[t]he type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories (1) facts about [planning activity] *prior* to the actual killing which shows that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing . . . (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim . . . and (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design." (*Anderson, supra,* 70 Cal.2d at pp. 26-27; *People v. Rivera* (2019) 7 Cal.5th 306, 324.)

*Anderson* goes to explain how the various factors may be applied. However, "[t]he *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way. [Citation.] Nor did *Anderson* change the traditional standards of appellate review that we have set forth above. The *Anderson* guidelines are descriptive, not normative." (*People v. Perez* (1992) 2 Cal.4th 117, 1125, citing *People v. Thomas* (1992) 2 Cal.4th 489, 516-517.)

11

"The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Perez, supra,* 2 Cal.4th at p. 1125; *Anderson, supra*, 70 Cal.2d at p. 27.) Further, because its guidelines are descriptive and neither normative nor exhaustive, reviewing courts need not accord them any particular weight. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Defendant argues there was insufficient evidence of each of the *Anderson* factors for the jury to convict him of first degree murder; rather, he argues that defendant, a homeless person, had been threatened and shot at in the recent past, just exploded with rage and stabbed another homeless person in midday in a public park in front of witnesses. However, even if the record supported a finding defendant was homeless, it does not actually show the jury was presented with evidence that defendant had been shot or threatened in the recent past or that he was fearful or hypervigilant as a result of a prior assault The defense had made certain offers of proof relating to such information, and considered allowing defendant to testify to those facts as supporting his theory of self-defense or heat of passion (relying on *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 [regarding the effects of chronic homelessness on a person's subjective fear]), but decided against having defendant testify, so he never presented that evidence, nor any expert evidence, such as that discussed in *Sotelo-Urena*.

Second, the argument ignores the principle that premeditation and deliberation may be formed in a very short time. That is the key in the present case. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*People v. Thomas, supra,* 25 Cal.2d at p. 900; see also *People v. Potts, supra,* 6 Cal.5th at p. 1027.) "Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*Potts, supra,* at p. 1027.)

In the present case, the jury heard evidence that defendant was angry because the victim had attempted to sit on steps defendant liked to sit on with his girlfriend, and that this typically made defendant angry. A short time later, defendant approached the victim in the park where the varied accounts indicate that both the defendant and the victim were yelling insults at one another and other varied accounts depicted either the defendant or the victim as the aggressor. But the matter of greatest significance was that during the brief physical altercation, defendant took a folded pocket knife from either his waist or his pocket, and opened out the blade, which he then used to stab the victim repeatedly.

While the violence occurred within a short time of the initial encounter, the fact defendant had to unfold the knife to prepare to use it reflects a premeditated intent to kill the victim by stabbing. Additionally, the repeated thrusts of the knife into the victim's torso, including a blow that went through his sternum and pierced the victim's heart, demonstrates that defendant was deliberately acting upon an intent to kill, even under an *Anderson* analysis.

13

Notwithstanding defendant's protestations on appeal about being provoked or fearful for his own life, the actual record lacks any evidence of his state of mind short of his own conduct and pretrial statements. The appellate arguments are based on defense counsel's offers of proof that were made to support the introduction of certain evidence or to secure a ruling from the court regarding instructions. But the statements or arguments of counsel are not evidence (CALCRIM No. 104), and the jury was not privy to the bench or chambers discussions regarding the admissibility of evidence or the proposed instructions to be given. It is therefore incorrect to argue that defendant was a homeless person who had been threatened in the recent past, making him fearful of the victim, because that information was not presented to the jury.

Based on the evidence presented to the jury, there is substantial evidence to support the findings of premeditation and deliberation.

2.      *CALCRIM No. 522 and the Prosecutor's Pinpoint Instruction Did Not Violate Defendant's Constitutional Rights.*

"The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. This sua sponte duty encompasses instructions on lesser included offenses that are supported by the evidence. [Citation.] Additionally, even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly. [Citation.] Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or

14

amplifying instructions absent a request." [Citation.] (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.)

"In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant." [Citation.] We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." [Citation.] (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.)

a. *CALCRIM Nos. 521, 522.*

Defendant claims it was error to instruct the jury using CALCRIM Nos. 521 and 522, although he acknowledges that the two instructions have been approved by precedents. Nevertheless, he claims that "provocation" has a technical meaning requiring additional instructional definition. We disagree.

CALCRIM No. 522 adequately instructed the jury that provocation applies both to first degree murder and second degree murder. Decisional authority has recognized that in this context, provocation is not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. (*Hernandez, supra*, 183 Cal.App,4th at p. 1334, citing *People v. Rowland* (1992) 4 Cal.4th 238, 270–271.) "Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' [Citations.]" (*Hernandez, supra,* at p. 1334, citing *People v. Ward* (2005) 36 Cal.4th 186, 215 ['provocation . . . is the

15

defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state'].)

Defendant has not cited any authorities supporting his assertion that "provocation" has a technical meaning, requiring further definition. We therefore follow the precedents approving the instructions. "Provocation and heat of passion as used in the instructions here bore their common meaning, which required no further explanation in the absence of a specific request." (*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218, citing *People v. Cox* (2003) 30 Cal.4th 916, 967.) This common meaning applies in the context of reducing a murder to manslaughter. (*Cole, supra,* at pp. 1217-1218.) The common understanding in both contexts is that something arouses a person's emotions and causes them to act out in anger. (*People v. Ward* (2005) 36 Cal.4th 186, 215 ["The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state."].)

Other reviewing courts have rejected challenges nearly identical to the claims of instructional error raised in this case. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001, relying on *Hernandez, supra*, 183 Cal.App.4th at p.1334.) We agree with those decisions and decline defendant's invitation that we reject the precedents upholding the correctness of the instructions on provocation. Thus, even if defense counsel had asked the trial court to further define provocation, the trial court could properly have refused to do so. For this reason, defendant cannot show that defense counsel's failure to request such an instruction was objectively unreasonable.

The instructions, read separately or together, correctly state the law applicable to the concept of provocation and defendant does not point to the existence of another instruction on which the trial court was required to give *sua sponte*. Absent such a *sua sponte* instruction which the trial court failed to give, and absent any pinpoint instructions proffered by defendant, there was no instructional error that requires reversal.

Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation. There was no instructional error insofar as the instructions on provocation were legally correct.

b. *CALCRIM No. 570.*

Defendant also argues that the supposed error in giving CALCRIM No. 522 was exacerbated by the reading of CALCRIM No. 570 to the jury. Again, we disagree.

CALCRIM No. 570 states:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

17

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

This instruction is correct, and fully explains the subjective aspect of provocation to the jury. (*People v. Jones, supra,* 223 Cal.App.4th at p. 1001.) In *Jones,* the reviewing court considered the interplay between the three instructions, CALCRIM Nos. 521, 522 and 570, finding all were correct statements of the law. It went on to explain, "They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed.

CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.'" [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*People v. Jones, supra*, 223 Cal.App.4th at p. 1001.)

The instruction is correct and the court properly and adequately instructed the jury on the principles of provocation applicable to this case.

19

3.     *Defense Counsel's Representation of Defendant Was Not Deficient for Not Requesting a Pinpoint Instruction on Provocation, or Objecting to the People's Pinpoint Instruction.*

Having rejected defendant's argument that the CALCRIM instructions addressing provocation were improper or inadequate, defendant argues that counsel was ineffective for "failing to request a pinpoint instruction on the aspects of provocation discussed in Argument II that the jury must understand in evaluating CALCRIM 522" further defining provocation, or objecting to the People's pinpoint instruction that provocation cannot be established solely by words.

The claim that a clarifying or pinpoint instruction should have been given has been forfeited for failure to preserve it in the trial court by a timely request. (*People v. Nieves* (2021) 11 Cal.5th 404, 436, citing *People v. Guerra* (2006) 37 Cal.4th 1067, 1134; see also, *People v. Jennings* (2010) 50 Cal.4th 616, 675.)  In addition, given the precedents approving the challenged instructions, defendant has failed to establish that counsel had a duty to request any pinpoint instruction to clarify the already approved instructions.

Recognizing that this claim of error was not preserved for appellate review, defendant argues his trial counsel provided ineffective assistance of counsel requiring reversal of his conviction.[3]  We disagree.

---

[3] Defendant also argues his counsel was ineffective for failing to request a mistrial when alternate jurors were seated upon the excusal of two jurors during deliberations for Covid-19 related reasons.  We treat that issue separately.

To obtain relief for ineffective assistance of counsel, a defendant must show both deficient performance "'and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.'" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 753, quoting *People v. Doolin* (2009) 45 Cal.4th 390, 421.) A claim that counsel's assistance was so defective as to require reversal therefore has two components: First, the defendant must show that counsel's performance was deficient. Second, defendant must show that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

As noted, there was no error in the trial court's instructions regarding self-defense or provocation. Defendant has not demonstrated counsel rendered deficient representation where the instructions were correct and needed no further clarification or definition.

Regarding defense counsel's failure to object to the People's pinpoint instruction that "Evidence of name calling, smirking, staring or the like is not sufficient provocation to meet the element under the theory of heat of passion voluntary manslaughter", defendant argues that words alone may be sufficient to provoke a lethal confrontation, and that counsel was ineffective for not familiarizing himself with the use notes following CALCRIM No. 570. Again, we disagree.

We acknowledge that the use notes to CALCRIM No. 570 make the broad statement that words may satisfy the provocation element needed to reduce a murder to

21

manslaughter: "The provocative conduct by the victim may be physical or verbal," as defendant urges, but defendant has omitted the remainder of the rule, "the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59, citing *People v. Berry* (1976) 18 Cal.3d 509, 515; *People v. Valentine* (1946) 28 Cal.2d 121, 138-139.)

Defendant ignores the parameters of that use comment. Heat of passion exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."' [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation. (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 125-126; see also, *People v. Berry* (1976) 18 Cal.3d 509, 512-515 [young wife repeatedly subjected older husband to sexual insults, rejection, and admissions of infidelity, causing him to strangle her in jealous rage]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586 [provocation lacking where defendant calmly shot bar patron who insulted and goaded him into firing]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [revenge does not reduce murder to manslaughter].)

"'Any type of provocation is sufficient if it is of such character and degree as naturally would excite and arouse such heat of passion, and verbal provocation may be sufficient.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 650.) Here, the question was whether the victim's reference to defendant and his friends as "beaners" or "wetbacks" could provoke a person to kill. The obvious answer is that a reasonable person would be offended but would not be adequately provoked by such comments to kill.

"The 'reasonable person' marks the standard for assessing provocation." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 739, citing *People v. Wickersham* (1982) 32 Cal.3d 307, 326-327.) Thus, while it is true, as defendant has stated, that the provocative conduct by the victim may be physical or verbal, it is incorrect to say that any verbal provocation will suffice. This is contrary to settled law requiring that the provocation be such that an ordinary person of average disposition would be provoked to act rashly or without due deliberation and reflection. (*People v. Moye* (2009) 47 Cal.4th 537, 550.)

The pinpoint instruction requested by the People did not improperly inform the jury that words alone could never mitigate a homicide, it merely clarified that the type of words used must be the type that would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Moye, supra,* 47 Cal.4th at p. 550.)

In this respect we note that defendant incorrectly relies on the verbal exchanges as the basis for defendant's provocation defense. The verbal epithets exchanged were

23

decidedly not the defense theory presented at trial to support his self-defense claim.  In this respect, defendant's theory respecting the purported error in instructions is a new theory that cannot be raised on appeal where it was not first presented in the trial court. "It is well established that a party may not change his theory of the case for the first time on appeal."  (*People v. Borland* (1996) 50 Cal.App.4th 124, 129, citing *People v. Witt* (1975) 53 Cal.App.3d 154, 174; *People v. Badgett* (1995) 10 Cal.4th 330, 351.)

The defense theory at trial was that the victim, a much larger man than defendant, was first to charge at or body slam the defendant and throw the first blow.  In other words, defendant acted in self-defense.[4]  During his closing argument, even defense counsel acknowledged that the insulting words yelled by the victim were not justified but he did not equate that to provocation.  Instead, defense counsel focused on the evidence suggesting that the victim was the aggressor, not that the defendant was provoked to stab the victim due to the insults by the victim.  Such a theory would have been an extreme longshot, where defendant was the first person to verbally insult and yell epithets to the victim.

Given the true defense theory that the victim was the aggressor who body slammed defendant and threw the first punch, such that a reasonable person of much smaller size might fear for his life and be justified in pulling a knife for self-defense, any conceivable error in giving the pinpoint instruction requested by the People is necessarily

---

[4] The various offers of proof alluded to earlier were all part of the defense effort to have the jury given instructions on self-defense.

harmless.  Under these circumstances, defense counsel's decisions cannot be deemed either deficient performance or prejudicial to defendant.

Because the instructions as given were proper and complete statements of the law, defense counsel's performance was neither deficient nor prejudicial.

4.     *Prosecutorial Misconduct*

Defendant argues that misconduct by the prosecutor during closing argument requires reversal.  We disagree.

During the rebuttal portion of closing arguments, the People argued:

"So the provocation that defense is suggesting to you is when the defendant supposedly fell on the ground, was body slammed, whatever you want to call it, based on the evidence there's nothing to suggest that happened.  But even if you want to carry it through to that, that's what he's saying is the provocation.

"As a result, the defendant acted rashly and under the influence of that provocation.  Now, if somebody pushes you to the ground, you might be bad.  You might get up, push him back, kick him back.  That would be a reasonable response to somebody doing that act to you.  And that's what the law asks to happen.  It says that a provocation had to have caused a person of average disposition to act rashly and without deliberation, to have compassion rather than judgment.  That's the type of situation, ladies and gentlemen, when a husband walks in on his wife in bed with another man, grabs a man [*sic*] and shoots.  That's what that is.  That's when a parent walks home, and finds somebody molesting their child, and they grab a bat and they beat the living snot out of a

25

person. That's what an average person would do in that situation. Not take out a knife and start stabbing somebody over and over and over and over and over and over again by crushing their larynx. That is not what an average person would do for being pushed to the ground. That's why this doesn't work. That's why he doesn't get voluntary manslaughter. It's not the same thing. As we talked about, the law makes you fall into very specific categories, or they will not give you a license to kill. And that's what he's asking for."

There was no objection to the argument. "'It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164, quoting *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; see also *People v. Krebs* (2019) 8 Cal.5th 265, 341, quoting *People v. Covarrubias* (2016) 1 Cal.5th 838, 894.) Defendant did not object to the prosecutor's examples of reasonable versus unreasonable response to provocation. While failure to object would not forfeit his claim when doing so would have been futile or an admonition would be insufficient to cure the purported harm, the record does not suggest that a timely objection would be futile or insufficient. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"A prosecutor is given wide latitude during closing argument. The argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th

208, 244.)  It is also well-settled that a "'prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and she may "use appropriate epithets.'" [Citations.]"  (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568.)

A conviction will not be overturned for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.  (*People v. Harrison, supra*, 35 Cal.4th at p. 244, citing *People v. Crew* (2003) 31 Cal.4th 822, 839.)

When attacking the prosecutor's remarks to the jury, "'"the defendant must show" that in the context of the whole argument and the instructions there was '"a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'"  (*People v. Beck and Cruz, supra*, 8 Cal.5th at p. 657, quoting *People v. Rangel* (2016) 62 Cal.4th 1192, 1219.)  "'""The question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.]"  (*People v. Jackson* (2014) 58 Cal.4th 724, 762, citing *People v. Linton* (2013) 56 Cal.4th 1146, 1205.)  Where the trial court properly instructs the jury on the legal principles applied to the case, and also instructs the jury that the attorneys' statements are not evidence, the challenged comments cannot be said to have infected the trial with unfairness or to have misled the jury.  (*People v. Jackson, supra*, at p. 762.)

Here there was no federal or state constitutional error because (a) the prosecutor did not misstate the law, (b) the court instructed the jury correctly on the legal principles

27

applicable to provocation, and (c) the court further instructed the jury that the statements of the attorneys were not evidence. Although defendant argues at length about how a prosecutor's misstatement of law may constitute reversible error, he fails to identify the precise misstatement of the law and explain how it infected the outcome.[5] Further, while he argues at length about the heat of passion doctrine and how it reduces the degree of the offense to manslaughter, he does not address the actual context of the prosecutor's statements, that is, addressing the defense theory of imperfect self-defense.

Viewed in the proper context of the actual defense theory argued to the jury, the prosecutor's comments did not mislead the jury or prejudice the defendant. Instead, the prosecutor's comments on defendant's theory of provocation was permissible fair comment, not misconduct, demonstrating the difference between provocation which might be considered adequate to reduce a murder to manslaughter, and provocation which is inadequate to mitigate the homicide.

In the alternative, defendant argues his trial counsel rendered ineffective assistance by failing to object to the prosecutor's statements on rebuttal. We have previously set out the standards for evaluating trial counsel's performance and need not repeat those principles. It suffices to say that where the prosecutor did not actually misstate the law, counsel cannot be ineffective for failing to object. Further, "'[a] defendant's conviction

_____

[5] At page 8 of his written oral argument, defendant asserts the misstatement of law flowed from a portion of the prosecutor's argument we recited above, arguing it conflated how an average person would react with what an average person would do. The illustrative examples were not a misstatement of law intended to mislead the jury, such as might constitute misconduct, and a timely objection would have given the court the opportunity to give clarifying instructions to the jury.

will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Harrison, supra*, 35 Cal.4th at p. 244.)

Because the court correctly instructed on the principles pertaining to provocation and self-defense, as well as instructing the jury that the statements by the attorneys were not evidence, no prejudice has been established.

5.      *Propriety of the Court's Instruction that Defendant Could Not Claim Self-Defense if He Provoked the Fight.*

Defendant argues the court erred in instructing the jury on "contrived self-defense," by reading CALCRIM No. 3472, because there was "no substantial evidence to support that appellant provoked a fight or quarrel with the intent to use force." We disagree.

The challenged instruction informs the jury that "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Appellant did not object to that instruction but told the court that he was "definitely not asking for that one."

The court also read CALCRIM No. 200, covering the respective duties of judge and jury, which informs the jurors that, "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have

29

decided what the facts are, follow the instructions that do apply to the facts as you find them."

We review whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." (*People v. Spaccia* (2017) 12 Cal.App.5th 1278, 1287, citing *People v. Partlow* (1978) 84 Cal.App.3d 540, 558) In determining whether instructional error has been committed, we must consider the instructions as a whole, and assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. (*People v. Spaccia, supra,* at p. 1287, citing *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) Additionally, we are required to interpret the instructions, where possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

CALCRIM No. 3472 is a correct statement of law. (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333.) The language of the instruction is identical to an earlier CALJIC instruction, No. 5.55, and was approved by the California Supreme Court in *People v. Enraca* (2012) 53 Cal.4th 735, 761, where the Court explained that the self-defense doctrine ""may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has

30

created circumstances under which his adversary's attack or pursuit is legally justified." [Citations.]'"

We are bound to follow precedent from the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Although there was trial testimony that the victim charged the defendant and threw the first punch, the jury was free to reject that testimony in the face of prior inconsistent statements made to detectives by the same witnesses, who were friends of the defendant. There was no error in instructing the jury that if it disbelieved the witnesses' testimony, and, instead, believed defendant was the instigator and aggressor, it could find defendant was not entitled to claim self defense.

6.      *The Replacement of Two Jurors Due to Covid-19 Did Not Require a Mistrial.*

After the jury had begun deliberations, Juror No. 3 informed the courtroom clerk that she had tested positive for Covid-19, and the clerk promptly informed the Superior Court's Human Resources, pursuant to the adopted Covid-19 protocols. The court informed both counsel of this development and informed them of its intention to excuse that juror and seat an alternate, to which both counsel agreed. The court then randomly drew Alternate Juror No. 3 to preplace the excused juror. The court and counsel intended to give the appropriate instruction to the jury regarding recommencing deliberations as soon as Alternate Juror No. 3 appeared.

31

However, before that could happen, the court was informed by Human Resources that another sitting juror, Juror No. 4, having heard that Juror No. 3 had tested positive for Covid-19, had left the court. The court stated its intention to excuse that juror as well, and neither counsel present objected. Alternate Juror No. 1 was randomly selected to replace Juror No. 4. Defendant argues that trial counsel's failure to request a mistrial due to the excusal of two jurors who were replaced by alternates constituted ineffectiveness of counsel. We disagree.

We have previously explained the general legal principles governing our review of trial counsel's conduct at trial, so we will not repeat them here. We begin by pointing out that nowhere in defendant's argument does he cite to any authority holding that defense counsel has a duty to request a mistrial any time a juror is excused, requiring the seating of an alternate where there was no objection to excusing the juror. Nor has defendant demonstrated that the Covid-19 pandemic was not good cause to excuse the jurors, given the serious risks to public health posed by the virus. Nor has defendant shown that counsel's brief absence from the courtroom prejudiced the defendant where counsel was present at the time the first juror was excused and replaced by an alternate, and returned before the jury was instructed about recommencing deliberations.

A mistrial should be granted "only when "'a party's chances of receiving a fair trial have been irreparably damaged"'" (*People v. Ayala* (2000) 23 Cal.4th 225, 282), that is, if it is "apprised of prejudice that it judges incurable by admonition or instruction." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "Whether a particular incident is

incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*Id.,* at p. 854.)

"Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance. Nonetheless, a defendant could conceivably prove incompetence if his counsel's omission was shown to be grounded in ignorance or misapplication of the law rather than tactical considerations [citations] and if the motion for mistrial bore strong potential for success." (*People v Haskett, supra,* 30 Cal.3d at pp. 854-855.) Here, however, there is no evidence that counsel, a seasoned trial attorney, was ignorant of the circumstances warranting excusal and replacement of a juror.

Section 1089 governs the selection of alternate jurors and the circumstances under which, and when, an alternate may replace a regular juror. In pertinent part, the section provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (Pen. Code, § 1089; *People v Duff* (2014) 58 Cal.4th 527, 560.)

The statute therefore expressly authorizes the seating of an alternate juror "at any time, whether before or after the final submission of the case to the jury." A trial court

learning of grounds for dismissal of a juror "has an affirmative obligation to investigate." (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)  "However, '[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court.'  [Citations.]" (*People v. Duff*, *supra*, 58 Cal.4th at p. 560.)

Defendant does not argue that a juror testing positive for Covid-19 is insufficient cause to dismiss or excuse a juror, or any juror seated in close proximity to a juror who has tested positive for the virus.  Defendant also does not argue that a court, conducting a jury trial while rates of infection from Covid-19 were still high, does not have a duty to protect the rest of the jury and the other participants in the trial from risk of infection. The trial court referred to protocols being followed in this type of situation for each juror that was excused.  The second juror had been allowed to leave the court before the trial court could be made aware of it, so no opportunity was presented at which defense counsel could object even if he had been present when that information was presented. There was also no opportunity for the court to inquire of the juror ("investigate") about the reasons for needing to be excused.

Given the exigencies of a jury exposed to the coronavirus during deliberations, when the jury is sequestered together, and absent a showing that the court erroneously excused the jurors during deliberations, no ground for mistrial exists.  Absent a valid basis for a mistrial motion, counsel had no duty to make such a motion.

Defendant also argues that trial counsel, Mr. Cantrell, was absent at a critical juncture, thereby depriving defendant of a "diligent advocate" at all critical stages. However, counsel was present when Juror No. 3 was excused and replaced by Alternate Juror No. 3, at which time the court recessed to wait for Juror No. 4 to appear. The court then recessed until the jury appeared, and during the recess, the court heard other matters.

The record is ambiguous as to when counsel left the courtroom to handle his other matter. When the proceedings resumed outside the jury's presence, the court noted that Mr. Cantrell, defense counsel, was present. Then the court informed the participants that a second juror, Juror No. 4, had gone home after being informed that Juror No. 3 had tested positive for Covid-19, and that it intended to excuse the second juror and seat another alternate. The court asked both counsel if they wished to put anything on the record, and at this point a substitute attorney responded on behalf of defendant that he had nothing to put on the record. Alternate Juror No. 1 was seated in place of Juror No. 4.

The court then stated its intention of giving the admonition to the jury (regarding the duty to recommence deliberations) when the entire panel was present, and again the court asked if either party wanted to put anything on the record, to which the substituting defense counsel respondent he did not.

When the jury was fully assembled, the court admonished the jury to recommence its deliberations, for which defense counsel was present.

The discharge of both jurors was proper, and counsel makes no argument that the jurors should have been forced to remain on the jury. And while we agree that counsel should be present at all stages of the criminal proceedings, in order to find that counsel was ineffective, the burden is on defendant to show deficient performance in the failure to make a motion for mistrial, and that the failure caused prejudice. (*Strickland, supra,* 466 U.S. at p. 694; *People v. Lucero* (2000) 23 Cal.4th 692, 728.)

Here, there is nothing in the record to suggest that if Mr. Cantrell had been present he would have made an objection, much less that an objection would have been meritorious. Defendant does not argue the existence of grounds on which defense counsel should have objected to the dismissal of Juror No. 4 (counsel was present for the excusal of Juror No. 3) and has not demonstrated the existence of a meritorious ground for mistrial based solely on counsel's brief absence for the replacement of Juror No. 4, where the excusal was within the trial court's authority.

Counsel did not render ineffective assistance of counsel in failing to move for a mistrial based on the trial court's actions which were statutorily authorized.

7.    *No Cumulative Errors Warrant Reversal.*

Here, defendant received due process and we have found no errors. There is therefore no cumulative error. The zero effect of errors, even if multiplied, remains zero. (See *People v. Loewen* (1983) 35 Cal.3d 117, 129, citing *People v. Gale* (1973) 9 Cal.3d 788, 806, [dis. Opn. Mosk, J. ("Six times zero, in my arithmetic, still equals zero.")].)

36

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.

We concur:

McKINSTER_____
J.

RAPHAEL_____
J.