Filed 9/29/23  P. v. Rosales CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICOLAS BRITO ROSALES,<br><br>    Defendant and Appellant. | D080386<br><br><br>(Super. Ct. No. SCD266444) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal, Andrew Mestman and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Nicolas Brito Rosales of second degree murder (Penal Code,[1] § 187, subd. (a)), and found true an allegation that he intentionally and personally discharged a handgun, proximately causing great bodily injury and death (§ 12022.53, subd. (d)).

The court sentenced Rosales to 19 years to life in state prison:  15 years to life for the murder conviction plus four years for the gun enhancement.

Rosales contends:  (1) the court erroneously declined to instruct the jury on imperfect self-defense; (2) defense counsel provided ineffective assistance by conceding that because Rosales did not testify, no basis existed to give that instruction, as well as by not objecting to the prosecutor's repeated use of the term "murder" when examining trial witnesses; (3) the court erroneously excluded evidence of the victim's domestic violence acts; and (4) the court's oral instruction of the jury in the reporter's transcripts erroneously used the word "rationally" instead of "rashly."  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

At trial and on appeal, Rosales has conceded that on April 19, 2011, he shot and killed Jalal Abou, claiming he acted in self-defense.  As Rosales does not challenge the sufficiency of the evidence to support the conviction, we summarize the underlying facts to provide context for his contentions.

Abou owned and operated an auto repair shop in San Diego, California, where he employed Rosales.  In April 2011, days before Abou was killed, a shop neighbor overheard an "intense argument" between Rosales and Abou, and became "concerned for [Abou] for a minute."  At trial, the neighbor was asked about his earlier testimony that during the argument he heard Rosales say he would kill Abou, but he did not remember:  "If I did, I did.  Taking in

---

[1]    Undesignated statutory references are to the Penal Code.

mind that I was taking a lot of medication . . . . So a lot of things I said, I can't remember a lot of it."

Abou's employee, F.Z., testified that Abou treated his employees "like family." F.Z. recalled that a few weeks before Abou was killed, Rosales, who F.Z. could not identify at trial, came into the shop one day and "said he wanted to pick up his mail." Abou was not there. Rosales became "real loud" and upset that his mail was not there. Rosales was aggressive and used foul language. As customers were in the shop, F.Z. asked Rosales to "tone it down and not use the language." When Abou returned, he explained to F.Z. that "he's holding [Rosales's] mail because he's a previous employee as a favor for him because he didn't have an address."

A few days later, Rosales returned to the shop, again looking for his mail. He again became upset as neither his mail nor Abou was present at the shop, and used foul language, and "wanted to know where his fucking mail was."

When Rosales returned to the shop a third time, Abou explained to him that the mail had not arrived, and the two men went outside to the area next to the side of the building and talked in a "normal" tone. F.Z. also testified that he did not know Abou to carry weapons.

On April 19, 2011, at about 7:00 a.m., a neighbor saw Rosales sitting in a car in front of Abou's shop.

Q.P. testified in September 2021, over 10 years after the incident occurred. He said that between 7:00 and 7:30 that morning, while driving on his way to work, he was stopped in traffic in front of Abou's shop. Q.P.'s car windows were closed and he was playing music. He observed "two older guys fighting." One (later identified as Abou) was dressed in blue clothing, and the other (later identified as Rosales) wore a yellow shirt. As they fought, Abou

3

stepped back, appeared to grab an object that looked like an umbrella, and pointed it at Rosales. Rosales ran to a car and began "digging" in the glove box. Abou stepped back. Rosales "took off running to the other side of the car." Rosales looked scared and appeared to be "ducking and dodg[ing]." At that point, Q.P. drove off. Q.P. saw no weapons and heard no gunshots.[2] The portion of the incident that Q.P. observed lasted between 10 and 12 seconds.

A police officer who interviewed Q.P. shortly after the killing testified that Q.P. said he did not see a gun, and that if Abou had one in his hand, "[Q.P.] would have seen it."

A neighbor heard the sound of gunshots, went over to the shop, and saw Abou's body.

Rosales's family member testified Rosales had left home at about 6:00 o'clock that morning. A few hours later he returned, "rushing," and said he needed to go to Mexico immediately. A United States Customs and Border Protection agent testified that a vehicle registered in Rosales's son's name crossed into Mexico at approximately 9:00 o'clock that morning.

---

[2]    The prosecutor asked Q.P. on direct examination: "I just want to make sure we're clear. So as you sit here today, are you saying that if there was a gun, you would have saw it [*sic*] or you don't know? Q.P. answered: "At that time I wasn't paying attention like that, I really wasn't focused on [*sic*]. I wasn't focused on that, I wasn't focused on looking for a gun. I mean, I just— at the time I saw it, I saw what I saw and you know I was not paying attention[.]"

On cross-examination, defense counsel asked Q.P. whether the object he saw in Abou's hand could have been a gun. Q.P. replied, "I can't say that. I mean, I can't, you know. What I saw is I just said to myself it [*sic*]. I was just having a good time drinking my coffee. I just said (*sic*) the old man [Abou] got an umbrella and took off running. That's all. I was not looking, is it a gun, I didn't care. I wasn't paying attention like that."

4

Detectives who processed the crime scene recovered no firearms, shell casings or bullets.

The Chief Medical Examiner for San Diego County performed an autopsy on Abou and testified he sustained four gunshot wounds from a distant to intermediate range, and some in a downward direction. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

## DISCUSSION

### I. *Instructional Error Claim*

#### A. *Lack of Evidence to Support the Jury Instruction*

Relying solely on Q.P.'s testimony, Rosales contends the trial court erroneously declined his request for an imperfect self-defense jury instruction on grounds that Rosales did not testify. Rosales sets forth the entire evidence supporting his contention: "Although [Q.P.] did not use the term self-defense, he nevertheless described what each combatant did in a way that strongly suggested Rosales responded defensively to Abou's aggression in fear for his life. [¶] [Q.P.] testified, for example, that during what was a very physical altercation, the two combatants ended up fighting in and out of a car parked in the parking lot. At one point, [Q.P.] saw Abou step back from the car and point something at Rosales, whereupon Rosales turned and ran to the back of the car, looking 'really scared,' ducking and dodging with his head and shoulders, crouching down, and swaying from left to right with his head and shoulders."

Rosales further argues the same basis for the court's instruction on perfect self-defense supported giving the imperfect self-defense instruction: "Clearly, [Q.P.] presented what was substantial evidence to have warranted an instruction as to perfect self-defense, but it therefore was also sufficient to

5

warrant an instruction as to imperfect self-defense as well. For some reason, however, the court was under the misguided impression that in the imperfect self-defense context (as opposed to perfect self-defense) a defendant's subjective belief could only be established through that person's own testimony. . . . [T]his was an incorrect understanding of the law. [¶] Because there was substantial evidence supporting the subjective component of the two self-defense doctrines, and because self-defense was Rosales' sole defense to the murder charge, the court erred in concluding an instruction as to imperfect self-defense could not be given. Furthermore, conditioning giving the imperfect self-defense instruction on Rosales testifying deprived Rosales of his Sixth Amendment right to present a defense."

A. *Background*

In discussing motions in limine with the parties, the court stated its intent to instruct on self-defense: "You've got [Q.P.] who says there's a fistfight. And then after the fistfight, [ ] Abou pointed something at something, [*sic*] and then [Q.P.] leaves and then there's some shots fired. Okay. I mean, I think it's appropriate given those facts that we give a self-defense instruction or a perfect self-defense [instruction] if the defendant testifies."

After Q.P. testified, defense counsel requested a voluntary manslaughter jury instruction based on imperfect self-defense. The prosecutor objected that no evidence was introduced regarding Rosales's subjective thought processes: "[T]here should have to be evidence of what he was actually perceiving[.]" The court tentatively modified its earlier ruling in that it no longer qualified the giving of a perfect self-defense jury instruction on whether Rosales testified: "The basis is that they were in a huge fist fight and [Q.P.] describes a very robust fight between the two of them. And there's

6

kind of a lot of running around and scurrying around. But they're still engaged in conflict and so there's evidence that something was pointed at Mr. Rosales."

However, the court deferred ruling on imperfect self-defense pending any testimony from Rosales. After the defense rested with Rosales not testifying, the court revisited the matter in this colloquy with defense counsel:

"[The court]: . . . first of all, [defense counsel], are you asking for [a lesser included offense] of manslaughter?

"[Defense counsel]: I am, your honor.

"[The court]: Okay. And so I think the only—there's two types of manslaughter[;] honest but unreasonable and heat of passion. [Rosales] did not testify, so I think that precludes the giving of honest but unreasonable [instruction]. Do you agree with that?

"[Defense counsel]: I would agree with that.

"[The court]: Okay. And so I think that then we'll do the [lesser included offense], it will be heat of passion. Is there any other [lesser included offense] that you are asking for?

"[Defense counsel]: That's the only [lesser included offense]. But we have not gone over the self-defense instruction.

"[The court]: Right, and self-defense is another instruction that we would be giving."

Defense counsel argued in closing that as Abou attacked Rosales with a gun, Rosales shot him in self-defense.

The court instructed the jury with CALCRIM No. 505 on perfect self-defense and with CALCRIM No. 571 on voluntary manslaughter based on heat of passion.

B. *Applicable Law*

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) " 'A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 153 (*Breverman*), quoting § 192.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197 ["Lesser included offenses of first degree premeditated murder include second degree murder, voluntary manslaughter, and involuntary manslaughter"]; *Breverman,* at p. 154.)

"A killing committed because of an unreasonable belief in the need for self-defense is voluntary manslaughter, not murder." (*People v. Elmore* (2014) 59 Cal.4th 121, 129.) "[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).) A killing based upon an unreasonable belief in the need for self-defense obviates malice because malice cannot coexist with an actual belief that the lethal act was necessary to avoid death or serious bodily injury. (*Ibid*, citing *People v. Beltran* (2013) 56 Cal.4th 935, 951.)

A trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder whenever there is evidence from which a reasonable jury could conclude that a manslaughter, but not a murder, was committed. (*People v. Elmore, supra*, 59 Cal.4th at p. 134; *Breverman, supra*, 19 Cal.4th at p. 162.)

The California Supreme Court has stated: "An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable

belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. . . . [¶] . . . Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132-133.)

"In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman, supra,* 19 Cal.4th at p. 177.) "[C]ourts should not evaluate the credibility of witnesses, a task for the jury." (*Id.* at p. 162.) "We review de novo a trial court's decision not to give an imperfect self-defense instruction." (*People v. Simon, supra,* 1 Cal.5th at pp. 132-133.)

In *Manriquez, supra,* 37 Cal.4th 581, the court addressed defendant's claim the trial court erroneously failed to instruct on imperfect self-defense: "[W]e examine a record in the present case that is devoid of evidence suggesting that . . . [defendant] harbored an actual belief in the need for self-defense against an imminent danger to life or great bodily injury." (*Id.* at p. 581.) The court summarized the testimony and concluded it "at most revealed that defendant may have harbored some fear of future harm but provided no indication that [he] '*actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury' [citation], the evidence clearly was insufficient to require the giving of defendant's requested instruction regarding imperfect self-defense. [Citation.] We therefore conclude the trial court correctly refused to instruct the jury on imperfect self-defense." (*Id.* at p. 582.)

9

C. *Analysis*

The only eyewitness to a portion of the altercation, Q.P., was stopped in traffic for approximately 10 to 12 seconds and caught a fleeting glimpse of the parties, but he did not hear anything they might have said. He saw no gun at the scene. He saw Abou grab an object (which Q.P. believed was perhaps an umbrella) and point it at Rosales. In response, Rosales ran to a car and started rifling through its glove compartment. Rosales afterwards ran, dodged and ducked, and looked scared. At that point, Q.P. left because traffic moved on. The absence of the sounds and words the men might have used during the fight limits any inference that may be drawn regarding Rosales's mental state. Further, the fact Q.P. left before any weapon was fired leaves a gap in the record as to what happened leading up to a gun appearing and ending up in the hand of Rosales, who fired it, killing Abou. Here too, the record is "devoid of evidence suggesting" (*Manriquez, supra,* 37 Cal.4th 581) Rosales believed he was in imminent danger of death or great bodily injury to support an imperfect self-defense instruction.

The California Supreme Court has stated that "[t]he belief required to support imperfect self-defense is that the defendant 'was in imminent danger of death or great bodily injury.' [Citation.] This doctrine is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with.*" ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 97-98; accord, *Manriquez, supra,* 37 Cal.4th at p. 581.) The evidence here simply does not comport with *Landry*. While "[t]he trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of

10

the case," instructions based solely on conjecture and speculation should not be given. (*People v. Young* (2005) 34 Cal.4th 1149.)

Even if we concluded the trial court committed instructional error, any presumed error was harmless. Depending upon the basis of the claimed error, instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, at p. 836.) We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the error was harmless under either standard. The jury's verdict finding Rosales guilty of second degree murder implicitly rejected the defense claim he acted in self-defense, "leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense. [Citation.] Accordingly, even if we were to assume the failure to instruct on imperfect self-defense violated defendant's constitutional rights, we would find the error harmless." (*Manriquez, supra,* 37 Cal.4th 547, at p. 582.)

We also point out that apart from the fact there was no eyewitness to the actual shooting, Rosales had gone to Abou's shop in the weeks before the murder, and was loud and aggressive, and used foul language in demanding his mail. Also, police recovered no gun at the crime scene. Further, after killing Abou, Rosales immediately fled to Mexico. The jury was instructed

11

with CALCRIM No. 372 that a defendant's flight may show his consciousness of guilt.

As to Rosales's claim that the same evidence supported the instruction on perfect self-defense and imperfect self-defense, we find no error. The California Supreme Court addressed a similar contention and ruled: "Because we conclude there was not substantial evidence supporting [defendant's] actual belief that he was in imminent danger of great bodily injury or death, the trial court would not have erred had it likewise refused to instruct on complete self-defense." (*People v. Simon*, *supra*, 1 Cal.5th at pp.131-134.) The same analysis applies here. Rosales received a benefit when the court instructed on perfect self-defense based solely on Q.P.'s fleeting perceptions that did not include any substantial evidence regarding Rosales's state of mind.

In arguing the court's error was prejudicial, Rosales relies on *People v. Viramontes* (2001) 93 Cal.App.4th 1256. But that case does not help him because, unlike here, that court found "[t]he evidence supported instruction on both self-defense and imperfect self-defense." (*Id.* at p. 1263.) Specifically, two witnesses "testified they saw someone shoot at appellant first. This testimony was supported by undisputed forensics evidence establishing the use of two guns, with at least one shot fired from one gun and at least seven shots fired from the other gun. Numerous witnesses described hearing a pause between the first shot and subsequent shots, and [one witness] testified it sounded as if two different guns were firing from different areas in the garage. If the jury believed these witnesses, it could find appellant had an actual belief that he was in imminent peril and that lethal force was necessary to defend himself against the person who shot at him. Such a belief would appear to be objectively reasonable." (*Ibid.*)

12

Equally unavailing is Rosales's reliance on *People v. Vasquez* (2006) 136 Cal.App.4th 1176, in which the Court of Appeal reversed the trial court's denial of a motion to instruct on self-defense, and ruled the record supported that instruction: "The prosecution's chief witness against appellant testified [the victim] was choking appellant when appellant drew his gun and shot [him]. It was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death from being choked." (*Id.* at p. 1179.) In this case, the record contains no substantial evidence about the circumstances of the shooting and Rosales's mental state.

Rosales contends the court erred as a matter of law by ruling it could instruct on imperfect self-defense only if Rosales testified, and it violated his constitutional rights to a fair trial, to present a defense, not to testify, and to due process. Rosales misapprehends the court's ruling on the motion in limine, which occurred after Q.P.'s testimony. The court withheld a final decision on whether to instruct on imperfect self-defense until after Rosales elected whether to testify, as his testimony would provide the last possible opportunity to fill the evidentiary gap in the record regarding insights into his state of mind. In that context, after Rosales exercised his constitutional right not to testify, the court definitively concluded the record lacked any substantial evidence supporting an imperfect self-defense instruction and therefore declined to give it. In light of the above analysis, we find no basis for Rosales's claim that "[t]he court thus treated it as a principle of law that to warrant an instruction as to imperfect self-defense, Rosales's subjective mental state could only be shown by his own testimony to that effect." The court's comments were limited to the specific context of this case based on the way the record was developed and the absence of substantial evidence that Rosales actually but unreasonably believed he was in imminent danger.

13

Although the court stated it denied the instruction based on Rosales's failure to testify, we review the ruling, not the court's reasoning, and because the record lacks substantial evidence to support giving the instruction, its ruling was correct regardless of its reasons. (*People v. Camacho* (2022) 14 Cal.5th 77, 123 ["we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm' "].)

D. *Ineffective Assistance of Counsel Claim*

Rosales further claims that to the extent defense counsel invited the court's error and agreed with the trial court's decision not to instruct the jury on imperfect self-defense absent Rosales's testimony, counsel provided ineffective assistance.

Under *Strickland v. Washington* (1984) 466 U.S. 668, to make out a claim for ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) defendant was prejudiced; that is, there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Id.* at p. 689.) In reviewing this claim, we give significant deference to trial counsel's reasonable tactical decisions, and the " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 437, quoting *Strickland*, at p. 689.) It is not necessary to determine " 'counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland,* at p. 697.) " 'Surmounting *Strickland's* high bar is

14

never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) And it is "particularly difficult" for a defendant to prevail on direct appeal on a claim of ineffective assistance by trial counsel. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Having concluded no substantial evidence supported the imperfect self-defense instruction and any error the court committed in refusing to give it was harmless, we likewise conclude Rosales cannot make out the necessary showing of prejudice caused by defense counsel's failure to object to the court's denial of that instruction. Under the above authority, in the absence of prejudice, the ineffective assistance of counsel claim fails, as there is no reasonable probability of a different result absent defense counsel's conduct.

## II. *Additional Ineffective Assistance of Counsel Claim*

Rosales contends his trial counsel also provided ineffective assistance by failing to object to misconduct by the prosecutor, who several times in examining witnesses during trial used the word "murder" to refer to the underlying incident.

Rosales recognizes any claim of prosecutorial misconduct is forfeited because his trial counsel failed to object to the prosecutor's comments. He nevertheless argues there was reversible error: "Ultimately, absent the constant hammering home by the prosecutor that the killing was murder, a reasonable probability exists that but for counsel failing to have objected, the result in this case would have been more favorable to Rosales. At the very minimum, in light of the severity of the misconduct in this case, that misconduct going to the very heart of Rosales' defense, any and all confidence in the jury's second degree verdict murder was undermined by the prosecutor's careful grooming. The prejudice being apparent, reversal is compelled."

The People acknowledge the prosecutor erred, adding: "It is regrettable that the prosecutor's use of the term 'murder' during witness examinations was not immediately objected to." They also recognize defense counsel's representation fell below an objective standard of reasonableness, as Rosales "conceded killing [Abou], but claimed to have done so in self-defense. Therefore, the issue of the case was whether the killing was murder, or a lawful killing. Under this circumstance it is difficult to conceive any tactical reason to not object." The People nonetheless argue there was no prejudicial error based on the jury instructions the court gave.

The California Supreme Court has ruled that a "killing" should not be "characterized as 'murder' in advance of a verdict so finding." (*People v. Garbutt* (1925) 197 Cal. 200, 209; see *People v. Price* (1991) 1 Cal.4th 324, 480 ["Although it would be improper for a prosecutor to use the term 'murder' in questioning a witness about an unadjudicated killing, a prosecutor is of course free to argue to the jury, after all the evidence had been presented, that it should find that a killing was murder"].) In light of the above authority, we conclude the prosecutor's numerous references to "murder" during examination of the witnesses were improper. It was the jury's role to decide the ultimate question of whether Rosales committed murder or acted with justification so as to reduce the charge to voluntary manslaughter.

However, Rosales has failed to demonstrate how an objection sustained by the trial court and the striking of these references would have resulted in a more favorable verdict. Even without the prosecutor's use of those references, the jury was aware from the prosecutor's arguments that the prosecutor believed Rosales to be guilty of murder as charged.

Further, the trial court gave proper instructions defining the elements of the offense, reasonable doubt, heat of passion and self-defense. It also

16

correctly informed the jury of its duty to decide Rosales's guilt on the charges, and that the attorneys' comments are not evidence. We presume that jurors are intelligent people, capable of understanding and applying the jury instructions given. (*People v. Spaccia* (2017) 12 Cal.App.5th 1278, 1287; *People v. Henley* (1969) 269 Cal.App.2d 263, 271.) We conclude that in light of the entire record and the *Strickland* standard set forth above, Rosales has not shown prejudice to sustain this ineffective assistance of counsel claim.

### III. *Evidence Regarding the Victim's Prior Acts*

Rosales contends that under Evidence Code section 1103, "[t]he trial court erred, as a matter of law, in ruling that because there was no evidence [he] knew of the acts of domestic violence committed by Abou, the evidence of violent act upon [Abou's] wife was inadmissible." (Emphasis and some capitalization omitted.)

### A. *Background*

Rosales moved in limine to introduce character evidence under Evidence Code section 1103; specifically that in 2001, Abou engaged in domestic violence, pleaded guilty to that crime in 2002, and was arrested again in 2011 for hitting his wife and making a criminal threat. He argued in part, "The evidence is also relevant to support a claim of lawful self-defense. [ ] Abou's specific instances of prior violence and confrontational behavior can be used as circumstantial evidence that [ ] Rosales encountered a violent and dangerous individual where any reasonable person in the same situation would have found themselves in a position where self-defense was reasonable and necessary."

The prosecutor opposed the motion: "First, there is little evidence to suggest self-defense. [Abou] had no gun, and he was shot [four] times. [Q.P.] did see a scuffle, but nothing to support the use of deadly force. Thus, this

evidence would be likely more so an attempt to simply attack the character of an individual who was murdered. [¶] Second, the 2011 incident did not result in a conviction and there did not appear to be any witness aside from [Abou's wife]. Thus, should the defense introduce this it would create a trial within a trial as to whether the incident occurred and would be fairly time consuming. [¶] Lastly, there are many accounts of [ ] Abou otherwise being a great person and not a violent person."

The court excluded the evidence, in part on Evidence Code section 352 grounds that any probative value was outweighed by substantial prejudice: "I just don't think that the fact that [Abou] was arrested for harming his wife does not add [*sic*] that much to the equation, but it's going to take a lot of effort and witnesses and time to put on. So I just don't think that—and we're going to be litigating that or the family dynamics and I don't think that's what this case is about. It's not about what happened between [ ] Abou and his family that brought him to this point where he got mad at [Rosales] and then they got in a fight. So I think that's extraneous information that's really not helpful, and so I'm not going to let that in."

After the defense rested, counsel moved for a mistrial based on the prosecutor's closing argument to the jury regarding Abou's character. In denying that motion, the court in passing referred to its earlier decision to exclude testimony of Abou's prior acts: "A lot of the issues about the marital

18

issues I didn't let come in about [Abou's] arrest for domestic violence because there was no evidence that [Rosales] knew anything about that."[3]

---

[3]   Defense counsel objected to this statement the prosecutor made in closing argument: "Is it reasonable that a man [Abou] who had nothing more than some marital issues would be so upset that he would want to attack [Rosales] who he treated like family, who he allowed to pick up mail at his business for no reason other than just being nice and treating him like family that because of that he was so far at the end of his rope that he went after [Rosales?]"

Defense counsel conceded to the court, "I did not object at the time the statement was made; however, I believe that I should have made an objection. The reason for that is that specifically the objectionable part is the reference to 'that a man who had nothing more than some marital issues.' The issue is that [the prosecutor] is certainly aware that [ ] Abou had more than just marital issues. He was aware that [Abou] had been arrested three weeks before, he was on bond for two strikes and a felony spousal battery. He was aware of the fact that there were issues with [Abou's] son at the time. And certainly, the district attorney is given great leeway to argue issues, but what [the prosecutor] is not allowed to do is argue things that he knows are not true. I understand that the evidence wasn't presented. But just because the evidence wasn't presented to the jury doesn't mean the district attorney can simply ignore the fact that he knows those things to be true."

The court responded to defense counsel: "So you're saying that the evidence was not presented that [Abou] was having all these marital problems. It seems like I recall there was evidence he had been living in the shop for a time or something. But that really never got tied to him having marital issues. And a lot of the issues about the marital issues I didn't let come in about his arrest for domestic violence because there was no evidence that your client knew anything about that."

The court denied the motion, telling defense counsel: "So number one, I don't find that it rises to the level of prosecutorial error . . . . Number two, I don't find that what was said was highly prejudicial in the context of the entire case and the evidence in the entire case. And number three, I find that the time for you to make your objection was when making the statements, when [the prosecutor] said the things that he said. You did not object at that time, so I find that this is not timely."

19

B. *Applicable Law*

Evidence must be relevant to be admissible.  (Evid. Code, § 350.) Relevant evidence is evidence that tends to prove or disprove a disputed consequential fact.  (Evid. Code, § 210; *People v. Hardy* (2018) 5 Cal.5th 56, 87.)

Evidence Code section 1101, subdivision (a), prohibits the admission of evidence of a person's character to prove his conduct on a specified occasion. Evidence Code section 1103, subdivision (a), provides an exception to that rule, stating, "In a criminal action, evidence of the character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code s]ection 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

However, the trial court has discretion to exclude evidence under Evidence Code section 352, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*People v. Hardy, supra,* 5 Cal.5th at p. 87; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828 [evidence admissible under Evidence Code section 1103, subdivision (a), may be excluded based on Evidence Code section 352 in the trial court's discretion].)

"We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion.  [Citation.]  A  trial court's decision to admit or exclude evidence " ' "will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' "  [Citations.]  "This standard of review affords considerable deference to the trial court provided that the court acted

20

in accordance with the governing rules of law.  We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise."  (*People v. Mataele* (2022) 13 Cal.5th 372, 413-414.)

C. *Analysis*

The court performed the required balancing and concluded under Evidence Code section 352 that the evidence of Abou's prior acts was unduly prejudicial.  Rosales has not demonstrated the court's weighing was arbitrary, capricious, or absurd.  (*People v. Parker* (2022)  13 Cal.5th 1, 51.) In light of the minimal relevance of the evidence and the court's recognition of the significant amount of time that would be required to litigate Abou's domestic violence conduct, the court was well within its discretion to deny Rosales's motion in limine.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 930 [trial court did not abuse its discretion under Evidence Code section 352 by excluding evidence with limited probative value that "would have required 'a mini-trial' "].)  We conclude the trial court did not abuse its discretion by excluding the character evidence.

Although Rosales relies on the court stating its decision to exclude the prior acts evidence was based on the fact Rosales did not testify, we do not accord significance to that statement.  When the court ruled on the motion in limine, it did not rely on that ground.  It only mentioned that statement in passing in the context of a motion for mistrial, which was brought on a different ground.

IV.  *Errors in Reporter's Transcripts*

Rosales contends the reporter's transcript rendition of the court's instructions with CALCRIM Nos. 521 [first degree murder], and 570 [voluntary manslaughter, heat of passion] erroneously used the word

21

"rationally,"[4] while the written jury instructions given to the jury used the correct term, "rashly." Rosales argues we should reverse his murder conviction because the error was not harmless.

The court provided the jury with this written standard instruction on the duties of the judge and jury with CALCRIM No. 200: "Members of the jury, I will now instruct you on the law that applies to this case. I will give you a copy of the instructions to use in the jury room. Each of you has a copy of these instructions to use in the jury room. The instructions that you receive may be printed, typed, or written by hand. Certain sections may have been crossed-out or added. Disregard any deleted sections and do not try to guess what they might have been. Only consider the final version of the instructions in your deliberations."[5]

---

[4] Specifically, in instructing with CALCRIM No. 521 on first degree murder, the reporter's transcript shows the court erroneously used the word rationally: "The decision to kill made *rationally*, impulsively, or without careful consideration is not deliberate or premeditated." (Emphasis added.) Also, in instructing with CALCRIM No. 570 regarding voluntary manslaughter, the court orally stated: "Number two, as a result of a provocation, the defendant acted *rationally* and under the influence of intense emotion that obscured his reasoning or judgment. And number three, the provocation would have caused a person of average disposition to act *rationally* and without due deliberation." (Emphasis added.)

[5] In its oral pronouncement, the trial court slightly modified CALCRIM No. 200: "Members of the jury, I will now instruct you on the law that applies to the case. I will give you a copy of the instructions to use in the jury room. Each of you has—actually, I'm just going to give you one copy. It says here each of you will receive a copy, but you're going to get one copy for all of you to consider. All right. The instructions that you receive will all be typed."

22

Rosales acknowledges the source of the transcription error is unknown.[6] He also concedes that one of the erroneous references to "rationally" in CALCRIM No. 521 was "manifestly harmless" because it "went to the definition of premeditated murder and the jury found Rosales not guilty of first degree murder."

Rosales further concedes the jury sent a note to the trial court requesting guidance as to the first degree murder instruction in CALCRIM No. 521, and the jury used the correct term, "rashly," when discussing the instruction.[7] This undermines Rosales's claim regarding the discrepancy between the oral and written pronouncement of the jury instructions, and shows the jury was relying on the written version of the instructions.

As the California Supreme Court has stated, the law is well settled that as a general rule, the written instructions govern over oral instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 717; accord, *People v. Jurado* (2006)

---

[6] Rosales explains: "The record does not reveal whether the court and the prosecutor themselves inadvertently used the term rationally in place of rashly; whether the court simply misread the instructions and the prosecutor repeated what he heard; whether the reporter incorrectly heard what was said; whether the court and the prosecutor were not clear in their enunciation of the word; or whether it was simply an incorrect transcription by the reporter. Certainly there can be no question that neither the court nor the prosecutor intended to use the term rationally instead of rashly, nor is it clear from the record that they actually did. What we do know, however, is that what the Reporter's Transcripts present as having been said must be addressed here on appeal, because if the transcripts accurately reflect what was actually said, as unlikely as that otherwise is, Rosales was arguably prejudiced by the errors."

[7] The jury note, verbatim, sought "clarification" regarding CALCRIM No. 521's use of the expression, "A decision to kill made rashly . . . , not the amount of time."

38 Cal.4th 72, 123, ["when the jury has received an instruction in both spoken and written forms, and the two versions vary, we assume the jury was guided by the written version"].)  Here, we have no basis to depart from this general rule.  As the jury relied on the written version of the instruction to ask the court for a clarification, it likely relied on the correct written version of the other instruction for its deliberation.  Reversal is not warranted.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.